**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>NEAR INTELLIGENCE, INC., *et al.*,[1]<br><br>   Debtors. | Chapter 11<br><br>Case No. 23-11962 (TMH)<br><br>(Jointly Administered) |
| DRIVETRAIN, LLC, as Plan Administrator and Litigation Trustee of the Near Intelligence, Inc., et al., Litigation Trust,<br><br>   Plaintiff,<br><br>v.<br><br>MOBILEFUSE, LLC,<br><br>   Defendant. | Adversary Proceeding<br>No. 25-52298 (TMH) |

**AMENDED COMPLAINT**

Drivetrain, LLC, in its capacity as the Plan Administrator and Litigation Trustee (the "Trustee") of the Near Intelligence, Inc*., et al.*, Litigation Trust, appointed in the above-captioned chapter 11 cases of Near Intelligence, Inc., *et al.* (collectively, the "Debtors" or "Near"), hereby brings this action against Defendant MobileFuse, LLC ("MobileFuse") and alleges as follows:

**PRELIMINARY STATEMENT**

1.     This action involves claims for fraudulent transfer, breach of contract, and unjust enrichment related to a "round-tripping" scheme orchestrated by insiders at Near and MobileFuse,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (9004), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd.  The Debtors' headquarters is located at 100 W Walnut St., Suite A 4, Pasadena, California 91124.

Near's largest customer. The scheme ultimately cost Near over $50.7 million, with MobileFuse receiving tens of millions of dollars in fraudulent transfers and evading tens of millions of dollars more in contractual obligations.

2. Near was a data intelligence company that offered a suite of data products through which customers could access and curate one of the world's largest data sources on consumer behavior for marketing and operational insights. The business of collecting and maintaining massive real-time data sets on a global scale was highly capital intensive, with Near suffering losses each year since its inception in 2012, including net losses of $20 million in 2021, $100 million in 2022, and $37 million in the first six months of 2023. During this three-year period, Near struggled to raise sufficient capital to meet liquidity needs and fund operations.

3. In the fall of 2019, Near began exploring a business relationship with MobileFuse, a digital advertising company. Near initially sought to acquire MobileFuse, but the two companies instead entered into a series of usage agreements pursuant to which MobileFuse would pay monthly fees to Near for access to its data products.

4. Although the managers of Near and MobileFuse repeatedly described the two companies as important strategic partners, the reality was that the only partnership that existed was between (a) three members of Near's management—its Chief Executive Officer, Anil Mathews, its Chief Financial Officer, Rahul Agarwal, and its President, Shobhit Shukla (collectively, the "Near Insiders")—and (b) three of MobileFuse's insiders—its co-founder and former Chief Executive Officer, Val Katayev, its other co-founder and Chief Executive Officer, Ken Harlan, and its Director of Finance, Matt Sessanta (collectively, the "MobileFuse Insiders"). The Near Insiders and MobileFuse Insiders concocted a multifaceted scheme—concealed from others at both

Near and MobileFuse—pursuant to which MobileFuse and the Near Insiders would benefit greatly at Near's expense.

5.      Pursuant to this scheme, MobileFuse received tens of millions of dollars in services and data from Near, which *MobileFuse paid for with Near's money.* The Near Insiders first transferred millions of dollars from Near to MobileFuse under false pretenses and without Near's receiving reasonably equivalent value in exchange, and MobileFuse then used those transferred funds to make the millions of dollars in contractual payments it owed to Near (the "Payment Scheme"), as depicted in the following diagram:

**Step 1: Payments to MobileFuse for
nonexistent services**

**Step 2: Contractual payments to Near
for access to Near's data products**

6.      In sum, MobileFuse received tens of millions of dollars of data intelligence services from Near for little-to-no cost as the Near Insiders funneled cash to MobileFuse to bankroll its payments to Near. MobileFuse, meanwhile, was generating sufficient income from its other operations that it could have easily covered its debts to Near without these cash gifts.

7.      The Near Insiders had their own beneficial arrangement underlying the Payment Scheme: Mathews, Agarwal, and Shukla had acquired 10% of MobileFuse at a discounted price before the Payment Scheme began.  Using shell entities, the Near Insiders concealed this side investment from Near, its Board of Directors, and its shareholders.  On information and belief, the Payment Scheme helped cause the Near Insiders' stake in MobileFuse to grow more than 10x in purported value.  After all, the Payment Scheme fraudulently inflated MobileFuse's revenue and effectively offset millions of dollars in operating expenses.

8.      The ultimate loser in this scheme was Near.  While both MobileFuse and the Near Insiders were benefitting from the Payment Scheme, Near was being drained and deprived of cash flow over a three-year period.  Near eventually collapsed into bankruptcy as a result.

9.      The Trustee now seeks to (a) avoid and recover more than $25 million in fraudulent transfers made to MobileFuse; and (b) recover at least an additional $25 million in unpaid fees owed by MobileFuse.

## PARTIES AND RELEVANT NON-PARTIES

**A.      The Plaintiff**

10.      On December 8, 2023 (the "Petition Date"), the Debtors each filed a voluntary petition for relief in this Court under title 11 of the United States Code (the "Bankruptcy Code").  On March 13, 2024, the Debtors filed the *Modified Third Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Near Intelligence, Inc. and Its Affiliated Debtors* [D.I. 336] (the "Plan").  On March 15, 2024, the Court confirmed the Plan, as supplemented by the Debtors' filings on February 27, 2024, March 11, 2024, and March 13, 2024 [D.I. 305, 328, 337], in its Findings of Fact, Conclusions of Law, and Order Approving Adequacy of Disclosures on a Final Basis and Confirming the *Modified Third Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Near Intelligence, Inc. and Its Affiliated Debtors Pursuant*

*to Chapter 11 of the Bankruptcy Code* [D.I. 346] (the "Confirmation Order").  The Confirmation Order appointed the Trustee as the representative the Debtors' estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and vested in the Trustee the authority to "investigate[] and, if appropriate, pursu[e]" certain causes of action, including causes of action that previously belonged to Near.  This adversary proceeding prosecutes certain of Near's causes of action and is within the scope of the "MobileFuse Litigation" authorized in the Plan.  The Confirmation Order also vested in the Trustee the "authority to file, withdraw, or litigate to judgment objections to Claims."

11.     Debtor Near Intelligence, Inc. ("Near Inc.") was a Delaware corporation with its principal place of business in Pasadena, California.  It was the ultimate parent company of the other Debtors.

12.     Debtor Near Intelligence LLC ("Near LLC") was a Delaware limited liability company with its principal place of business in Pasadena, California.  It was the wholly owned subsidiary of Near Inc. and the successor in interest to Near Intelligence Holdings Inc. ("Near Holdco"), which was the successor in interest to Near Pte. Ltd ("Near Pte.").

13.     Debtor Near North America, Inc. ("Near NA"), formerly called UberMedia Inc., was a Delaware corporation with its principal place of business in Pasadena, California.  It was a wholly owned subsidiary of Near LLC.

14.     Debtor Near Intelligence Pte. Ltd. ("Near Singapore"), formerly Near Holdings Pte. Ltd., was a private limited company established under the laws of Singapore.  It was a wholly owned subsidiary of Near LLC.

15.     The diagram on the next page depicts the relationship between the four Debtors and their country of incorporation:



## B.    The Defendant

16.    Defendant MobileFuse is a Delaware limited liability company.  MobileFuse currently maintains locations in New Jersey and Massachusetts.  On information and belief, MobileFuse moved its headquarters to New Jersey no later than January 1, 2023.

## JURISDICTION AND VENUE

17.    The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012, because it arises under the Bankruptcy Code and is related to the above-captioned chapter 11 cases.  Moreover, there is a close nexus between this action and the Plan and Confirmation Order because, *inter alia*, this action forms a substantial part of the MobileFuse Litigation contemplated in the Plan.

18.    MobileFuse has a scheduled nonpriority claim in the amount of $724,730 in the above-captioned case (the "Scheduled Claim").  Pursuant to Federal Rule of Bankruptcy Procedure 3007(b), this adversary proceeding includes—and forms the basis for—the Trustee's objection to

that Scheduled Claim.  Additionally, this adversary proceeding includes claims by the Trustee under chapter 5 of the Bankruptcy Code to avoid and recover fraudulent transfers made to MobileFuse.  This is therefore a "core proceeding" under 28 U.S.C. § 157(b), and pursuant to Local Rule 7008-1, the Trustee consents to the entry of final orders and judgments by this Court.

19.     This Court has personal jurisdiction over the Defendant because it has sufficient contacts with the United States of America to be subject to nationwide service of process under Federal Rule of Bankruptcy Procedure 7004.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

<u>**FACTUAL BACKGROUND**</u>

**A.     Near Is Founded Overseas, Relocates to the United States, and Reorganizes.**

21.     Near was founded overseas in 2012 and eventually became one of the largest data intelligence companies in the world.  Anil Mathews and Shobhit Shukla co-founded Near, and Agarwal joined as Chief Financial Officer in 2015.

22.     Near offered a suite of software-as-a-service products through which users could access curated data based on large-scale, real-world, and real-time global data sets, such as locations, brand affinity, and geo-radius.

23.     In early 2021, Near's operations (*i.e.*, those of Near Pte.) were moved from Singapore to California to capitalize on the rise of domestic special purpose acquisition companies, or SPACs, and to potentially become a publicly traded company through a de-SPAC transaction.

24.     To become a more attractive target, Near undertook a significant reorganization, which included transferring the assets of Near Pte. to Near Holdco, a Delaware corporation based in California, and creating Near Singapore.  Near Holdco was eventually acquired by Near Inc. through a de-SPAC transaction in which Near Holdco's interests (and assets) vested in Near LLC. Near LLC is thus the successor-in-interest to both Near Holdco and Near Pte.

**B.      Near and MobileFuse Become "Strategic Partners."**

25.      Near had met MobileFuse in 2019, when Near was searching for acquisition targets. Beginning in September 2019, the Near Insiders and MobileFuse's co-founder and Chief Executive Officer, Ken Harlan, held a number of meetings to discuss a potential acquisition.

26.      By November 2019, their discussions had shifted towards a strategic partnership between the two companies, with MobileFuse committing to provide Near's data products to clients and the Near Insiders committing to a minority investment in MobileFuse. Specifically, (a) MobileFuse would provide Near's data products on MobileFuse's media advertising platform, (b) MobileFuse would pay Near set amounts for access to Near's data products, and (c) Mathews would invest $2 million in MobileFuse in exchange for a 10% ownership interest in MobileFuse.

27.      These discussions culminated in three agreements. The first agreement allowed MobileFuse—as the customer—to use Near's data products by paying certain monthly minimum fees (the "2020 Usage Agreement"), with such payments to begin on an agreed "Go-Live Date." The second agreement provided for Near—as the customer—to receive certain services from MobileFuse (the "2020 Services Agreement"), with such services to begin on the "Go-Live Date" set forth in the 2020 Usage Agreement. The Go-Live Date was planned to be June 30, 2020, but it was delayed. The third agreement, which was likewise delayed and not finalized until January 2021, provided for the Near Insiders to acquire a 10% indirect stake in MobileFuse for $2 million (the "2021 Membership Purchase Agreement").

28.      That indirect stake was not acquired through any Near entity. Instead, the Near Insiders used personal investment vehicles: Cecil Capital Pte. Ltd (an entity wholly owned by Mathews), Godspeed Advisors Pte. Ltd. (an entity wholly owned by Shukla), and Oriental Investment Advisors Pte. Ltd. (an entity wholly owned by Agarwal) created Marshall Islands entity Uniqequity Limited, which in turn created a wholly owned Singapore subsidiary, Uniqequity Pte.

Ltd. ("Uniqequity").  Uniqequity acquired the 10% stake in MobileFuse.  The following diagram shows how the Near Insiders used shell entities to acquire their 10% stake:

**Uniqequity Ownership:**



29.     Shortly after Uniqequity's investment in MobileFuse, the Near Insiders and the MobileFuse Insiders agreed on the contours of the Payment Scheme.  They first agreed to April 1, 2021, as the new Go-Live Date.  Thus, beginning April 1, 2021, MobileFuse was required under the 2020 Usage Agreement to pay Near Pte. monthly fees totaling "[u]p to USD 15 Million per annum by end of June 2021" and then "[a]t least USD 25 Million per annum thereafter."  Near Pte., in turn, was required to make payments to MobileFuse under the 2020 Services Agreement. Near's payments were supposed to be a percentage of the monthly media spend, if any, on Near's data products available through MobileFuse's media exchange, MobileFuse Exchange ("MFX"). As Harlan explained in an email, in April 2021 there was a media spend on Near data products of

$47,412.02 originating from the MFX platform. Accordingly, "under a 'normal' month," the resulting MobileFuse invoice to Near would be $42,670.82 ($47,412.02 x 90%):

---

**Re: press release and cost calculations**        Sent:    Thur 5/20/2021 4:32:45 PM (UTC)

From:    Ken Harlan

To:    Rahul Agarwal

---

Hi Rahul,

Thanks. Without the counter invoice and carry-over analysis, this invoice isn't meaningful yet, but I know we will get there.

Some data and thoughts on next steps here:
-During April, the media was $85,453.95, the breakdown is MFX-$47,412.02, Magnite/Rubicon-$38,041.94
-Under a "normal" month without any minimums, April invoices and cash flow would be as following:

1. Near invoices MF for $85,453.95
2. MF invoices Near for $42,670.82 ($47,412.02 x 90%)
3. 1 & 2 are paid same day or within a day of each other
4. Near's payment to Magnite/Rubicon is worked out between Near and Magnite

-Assuming we are aligned thus far, if we moved forward with the $1.25m, then the following happens:

1. Near invoices MF for $1.25m
2. MF invoices Near for $1.125m (90% x $1.25m)
3. 1&2 are paid same day
4. MF has a credit carry-forward of $1,082,329.18 ($1.125m -$42,670.82)
5. Near's payment to Magnite is unchanged

The problem with the credit carry-forward makes no sense to me and will add up quickly.

An alternative idea that may make more sense if you want to keep the $1.25m invoice is:

1. Keep the $1.25m invoice from Near to MF
2. MF invoices Near $1,207,216.86: $1.25m minus Magnite minus 10% of MFX, which is $1.25m - $38,041.94 - $4,741.20 = $1,207,216.86
3. Near's payment to Magnite unchanged

This solution has no credit carry-forward, but allows your revenue to be higher.

Let me know what you think and happy to discuss further.

---

30.    The Near Insiders and the MobileFuse Insiders, however, never followed the payment terms in the 2020 Services Agreement. Instead, they decided to have Near make monthly

payments to MobileFuse (the "Sham Payments") that approximated MobileFuse's monthly minimum payments to Near under the 2020 Usage Agreement (*i.e.*, over $1 million each month).

31.     No business rationale existed for Near to make such large monthly payments to MobileFuse; nor was there a legitimate reason for Near to calculate payments to MobileFuse based on amounts MobileFuse owed Near.  Indeed, there is no evidence that MobileFuse provided ***any*** goods or services to Near beyond the arrangement set forth in the 2020 Services Agreement, which Harlan had conceded would cost Near less than $43,000 in a "normal" month.

## C.     The MobileFuse Insiders Knowingly Participate in the Payment Scheme.

32.     Others at MobileFuse besides Harlan also assisted the Payment Scheme.  For example, Katayev was the managing member of MobileFuse, and with Harlan, the two owned over 90% of MobileFuse prior to the Uniqequity investment in January 2021.  As Harlan explained to the Near Insiders, any deal with MobileFuse required both Katayev's and Harlan's approval:



33.     This included the Uniqequity investment, with Katayev actively involved in the negotiations:

Message
_____

**From:**          Val Katayev [val@mobilefuse.com]
**on behalf of**   Val Katayev <val@mobilefuse.com> [val@mobilefuse.com]
**Sent:**          11/12/2019 1:42:13 AM
**To:**            Ken Harlan [ken@mobilefuse.com]
**Subject:**       Fwd: Final Offer : Mobilefuse + Near || Partnership

So this is not bad. I say we ask for $3m or $4m for 15% or 20%... but $2m at 10% is not a deal breaker, just such a puny number. Hard to get excited about $2m.

And I don't get the point of lowering to 2x even if the threshold stays the same $10m. I think if they stick to the original 3x buyout, we have something we can proceed with.

I miss anything?

We can present this on a call. I think a call will get us to the finish line on the terms.

34.    Moreover, Katayev knew that he and Harlan gave the Near Insiders a discounted investment deal to give rise to the Payment Scheme.  As Katayev confided in a Slack conversation with his brother Arnold, the "valuation is sucky [but], it[']s more strategic than money."  Katayev echoed similar thoughts in a separate Slack conversation with Sessanta:



35.    Katayev also was aware of MobileFuse's big jump in revenue resulting from the Payment Scheme, going as far as to publicly brag about MobileFuse's drastically increased revenue on social media:



MobileFuse's strong revenue performance during this date range was a result of the Near Insiders' sending MobileFuse a Sham Payment of $1,167,917.00 on July 26, 2021, as discussed in more detail below.

36.     Sessanta, as Director of Finance at MobileFuse, played a crucial role in coordinating payments with the Near Insiders.  Sessanta knew from the Payment Scheme's inception that the Near Insiders were funneling payments to MobileFuse for nonexistent services, as Harlan had forwarded on to Sessanta his early email exchanges with the Near Insiders outlining the Payment Scheme.

37.     Sessanta, as well as Harlan, also helped deceive Near's own internal controls and conceal the extent of the Near-MobileFuse relationship.  Namely, the Near Insiders kept the Payment Scheme and Uniqequity investment hidden from other Near personnel and outsiders, and the Sessanta and Harlan knowingly assisted the Near Insiders in that endeavor, making sure to communicate only with the Near Insiders about payments to and from Near.

**D.     MobileFuse Receives Over $25 Million in Sham Payments from Near.**

38.     Near made the first Sham Payment to MobileFuse on May 27, 2021.  Each Sham Payment followed a similar pattern: Before Near sent a Sham Payment, Agarwal and Sessanta would coordinate on what amounts MobileFuse owed to Near that month and then work backwards to calculate the amount Near needed to first send MobileFuse to allow MobileFuse to cover its legitimate accounts payable to Near at little-to-no cost.  Had the Near-MobileFuse arrangement

been legitimate, the process would have involved Sessanta's reviewing the monthly media spend on Near's data products and calculating the resulting amounts owed to MobileFuse.  But that did not happen, and MobileFuse instead provided Near with grossly inflated invoices for millions of dollars for the sole purpose of receiving sufficient amounts from Near to cover the amounts MobileFuse legitimately owed Near.  No part of their calculations involved determining what amounts, if any, Near might owe MobileFuse under the 2020 Services Agreement, and there is no indication that such amounts ever exceeded $100,000 for any given month.

39.     For example, the Payment Scheme in April 2021 worked as follows:  First, Near issued a $1.25 million invoice to MobileFuse, consistent with the monthly minimum fees under the 2020 Usage Agreement.  Next, because the Near invoice to MobileFuse was $1.25 million, the MobileFuse invoice going back to Near was contrived to be $1,185,569 (the $1.25 million that MobileFuse owed Near, less a fee of $57,549 and less "MFX Margin" of $6,882), as the following spreadsheet Agarwal emailed to Harlan revealed:

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | **Near to invoice MF:** | | | | | | | |
| 3 | | | Fixed Fee | $1,250,000 | | | | |
| 4 | | | | | | | | |
| 5 | **MF Invoice to Near:** | | | | | | | |
| 6 | | | Original | $1,250,000 | | | | |
| 7 | | Less: | MFX Margin | ($6,882) | | | | |
| 8 | | Less: | Magnite | ($57,549) (Near will pay Rubicon's share from this amount) | | | | |
| 9 | | | Final Invoice | $1,185,569 | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | **Near's Margin:** | | | | | | | |
| 13 | | | Gross | $64,431 | | | | |
| 14 | | Less: | Rubicon Pay | ($38,042) | | | | |
| 15 | | | **Net Margin** | $26,389 | | | | |
| 16 | | | | | | | | |

40.     Notably, Agarwal (not MobileFuse) was the party calculating *MobileFuse's* invoice, and Agarwal's calculations had no connection to the 2020 Services Agreement. That is, rather than having any economic substance, the MobileFuse invoices to Near were contrived (a) to cover MobileFuse's payments to Near; and (b) to conceal the Payment Scheme from oversight and other prying eyes.

41.     The next step in the Payment Scheme was the coordination of payments. The Near Insiders timed the payments with the MobileFuse Insiders such that Near would first make a Sham Payment to MobileFuse and only then would MobileFuse send its contractually owed payment to Near. As Sessanta told Agarwal when coordinating the first set of payments in May 2021, "I'll initiate the wire [to Near] immediately after receiving [the $1.25mm wire from Near]."

**Re: press release and cost calculations**

| | |
|---|---|
| Sent: | Wed 5/26/2021 3:03:46 AM (UTC) |
| From: | Matt Sessanta |
| To: | Rahul Agarwal |
| CC: | Ken Harlan |

Rahul,
I hope all is well. Pleasure to meet you. Thanks for the heads up on the wire. I'll initiate the wire immediately after receiving it.

Regards,
Matt

42.     From May 2021 through September 2023, the Payment Scheme involved Near making over $25 million in Sham Payments to MobileFuse in the amounts and on the dates reflected on Table 1 below:

**TABLE 1**

**SHAM PAYMENTS**

| Payor Entity | Date | Amount |
|---|---|---|
| Near Pte. Ltd. | May 27, 2021 | $1,185,569.00 |
| Near Pte. Ltd. | June 30, 2021 | $1,155,880.00 |
| Near Pte. Ltd. | July 26, 2021 | $1,167,917.00 |
| Near Pte. Ltd. | October 20, 2021 | $2,765,694.00 |
| Near Pte. Ltd. | January 26, 2022 | $1,408,046.00 |
| Near Intelligence Holdings Inc. | September 29, 2022 | $1,595,040.00 |
| Near Intelligence Holdings Inc. | September 29, 2022 | $1,250,096.00 |
| Near Intelligence Pte. Ltd. | February 6, 2023 | $4,295,024.00 |
| Near Intelligence Pte. Ltd. | February 28, 2023 | $1,404,533.00 |
| Near Intelligence Pte. Ltd. | May 11, 2021 | $1,369,349.00 |
| Near Intelligence Pte. Ltd. | June 15, 2023 | $1,390,481.00 |
| Near Intelligence Pte. Ltd. | June 28, 2023 | $2,500,000.00 |
| Near Intelligence Pte. Ltd. | June 28, 2023 | $236,195.00 |
| Near Intelligence Pte. Ltd. | September 13, 2023 | $2,500,000.00 |
| Near Intelligence Pte. Ltd. | September 13, 2023 | $250,574.00 |
| Near Intelligence Pte. Ltd. | September 28, 2023 | $1,195,508.00 |
| **Total** | | **$25,669,906.00** |

43.     Each of these Sham Payments originated from the bank account of the Near entity listed in the Payor Entity column, and each was deposited that same day or soon thereafter into a MobileFuse bank account.

44.     Not one of the Sham Payments was made at arm's length or in exchange for reasonably equivalent value.  The Near entities making these Sham Payments did not actually owe these amounts to MobileFuse; nor did Mobilefuse otherwise provide—or the Near transferor receive—reasonably equivalent value in exchange for the Sham Payments.  Their seemingly sole purpose was to fund MobileFuse's payments back to Near to satisfy the debts that MobileFuse legitimately owed under the Usage Agreements (defined below).  Had the Near Insiders not caused Near to make the Sham Payments, Near would have had another $25.67 million in additional cash.  That is, the Sham Payments cost Near approximately $25.67 million and funneled that money to

MobileFuse, an entity in which the Near Insiders owned an undisclosed 10% stake through Uniqequity.

45.    Moreover, the Sham Payments did not result in a net benefit to the Near entity making the transfer or Near in general.  For example, consider the Sham Payment addressed in paragraph 39 above and the first line of Table 1 above.  In May 2021, MobileFuse already owed Near $1.25 million for the previous month under their 2020 Usage Agreement.  That debt was still outstanding when, on May 27, 2021, Near Pte. sent MobileFuse approximately $1.185 million.  Near Pte. did not owe MobileFuse this amount; nor did MobileFuse provide any value to Near Pte. in exchange for this Sham Payment.  The Sham Payment thus increased the amount that MobileFuse owed Near to $2.435 million (the $1.25 million MobileFuse owed under the 2020 Usage Agreement + the $1.185 million debt that receipt of the Sham Payment should have created).  MobileFuse, however, never recognized the $1.185 million it received as creating a debt and never repaid it.  Nor, for its part, did Near Pte. book the transfer as a loan, cash advance, or investment.  When MobileFuse transferred $1.25 million to Near Pte. three business days later, it satisfied MobileFuse's monthly obligation under the 2020 Usage Agreement but did nothing to reduce the $1.185 million debt created by its receipt of the Sham Payment.  Accordingly, the May 2021 Sham Payment cost Near Pte. $1.185 million.  If Near Pte. had not made the May 2021 Sham Payment, its assets would have included the $1.185 million sent to MobileFuse plus the $1.25 million payment from MobileFuse.

46.    The same pattern continued with every Sham Payment listed above.  MobileFuse (a) received each Sham Payment, (b) never gave the Near transferor reasonably equivalent value (if any value) in exchange for a Sham Payment, (c) never recognized a debt owing to the Near transferor as a result of a Sham Payment, and (d) never repaid a Sham Payment.  The net result of

the Sham Payments was thus two-fold:  a $25.67 million decrease in Near's cash reserves (*i.e.*, its assets) and a $25.67 million no-strings-attached cash infusion to MobileFuse, all done with the knowledge, approval, and assistance of the MobileFuse Insiders, including then-CEO, Ken Harlan.

47.     MobileFuse's transfers to Near were not repayments of the Sham Payments. Rather, both companies classified MobileFuse's transfers as satisfying debts that it already owed to Near under their data usage agreements (collectively, the "Usage Agreements").  In addition to the 2020 Usage Agreement described above, Near Pte. and MobileFuse entered into the Near Platform Usage Agreement dated January 1, 2022 (the "2022 Usage Agreement"), and Near NA and MobileFuse entered into the Near Platform Usage Agreement dated January 1, 2023 (the "2023 Usage Agreement").[2]  Each Usage Agreement superseded its predecessor.

48.     Under each Usage Agreement, MobileFuse would receive access to Near's data products for a fixed fee.  Near provided this access and data, and MobileFuse owed agreed to pay Near fixed fees on a regular basis for this access.  MobileFuse CEO Harlan described the Usage Agreements as a "sweetheart deal" for MobileFuse.

49.     Under the 2022 Usage Agreement, MobileFuse was required to pay $1.5 million per month for access to Near Pte.'s data products, as well as "mutually agreed [rates] from time to time" for advertising campaigns.  Under the 2023 Usage Agreement, MobileFuse was required to pay Near NA minimum fees of $18 million per year (in lieu of monthly installments) for two years, and "Additional Usage Fees" potentially worth millions more in monthly variable fees based on usage.

50.     The 2023 Usage Agreement further provided that it could not terminate unless the terminating party gave "six (6) months prior written notice to the other party" and that "if

---

[2] Copies of the 2020 Usage Agreement, 2022 Usage Agreement, and 2023 Usage Agreement are attached as, respectively, Exhibit A, Exhibit B, and Exhibit C and are incorporated by reference.

[MobileFuse] terminates th[e] agreement for any reason, . . . [MobileFuse] will be liable to pay a fixed fee[] equivalent to USD 250,000 for each remaining month from the date of the termination till the end of the . . . [t]erm."

51.     MobileFuse's email correspondence and payment details confirm that all payments MobileFuse made to Near during the Payment Scheme were made to satisfy MobileFuse's debts under either the 2020 Usage Agreement or 2022 Usage Agreement.  No amounts went towards repaying the Sham Payments or towards the 2023 Usage Agreement.

52.     As the Payment Scheme progressed, the Sham Payments became more difficult to mask, as banks and auditors began asking questions about the Near-MobileFuse relationship.  To avoid scrutiny, the Near Insiders warned the MobileFuse Insiders that third parties were sniffing around and asked that they play along.

53.     One misdirection was to wire the Sham Payments to MobileFuse through currency exchange MonFX, which allowed Near's payments to MobileFuse to avoid scrutiny.  For example, on or about February 6, 2023, Agarwal caused Near to send MobileFuse $4,295,024 from Near's MonFX account.  This had no economic purpose, as Agarwal did not exchange currency in the transaction.  Instead, Agarwal had caused Near Singapore to transfer U.S. dollars to MonFX and then had MonFX transfer those U.S. dollars to MobileFuse.[3]  As the MobileFuse Insiders knew, Agarwal was making this transfer so that Near's books would not show a direct payment to MobileFuse—*i.e.*, he did so to mask the recipient, and to evade and defeat Near's internal controls, avoiding scrutiny and detection.

54.     The Near Insiders and the MobileFuse Insiders also concealed the Payment Scheme by creating false documentation supporting the Sham Payments.  Examples include: (a) faking

---

[3]  MonFX, like a bank with respect to a customer's account, did not have dominion and control over the Near funds it received and functioned only as a mere conduit in the Payment Scheme.

invoices that directed payment to MobileFuse but supposedly originated from an entity named "MFX Exchange LLC" in Boston, despite no such entity appearing to ever having existed; and (b) classifying costs linked to MobileFuse and/or "MFX" in Near's books as "data acquisition costs," despite there being no evidence that MobileFuse was providing any data to Near.

55.     The Near Insiders and the MobileFuse Insiders also worked together to create false, post-dated agreements.  One of the more egregious examples was a purported data license agreement between Near and MobileFuse stating that it had been signed and become effective on June 30, 2020 (the "Sham MFX Agreement").  In reality, this document was not created until February 2022, when Agarwal had Near's legal department create an undated draft.  Agarwal then added "June 30, 2020" to the document (as well as payment figures to the appended draft work order) before sending a copy to Mathews on February 21, 2022 in an email with the subject line "CONFIDENTIAL | MFX Data Agreement."



It would take until March 30, 2022 (almost two years after its purported "effective date") for this document to be signed by both Mathews and Harlan, with email exchanges between Agarwal and

Harlan indicating that both understood that the Sham MFX Agreement was intended to help justify past (and future) Sham Payments from Near to MobileFuse.  Even then, payments were not due under the Sham MFX Agreement except as stated in specific orders signed by Near Pte. and MobileFuse.  No such orders were ever issued or executed.

**E.    The Near Insiders Abandon Their Fiduciary Duties at Near's Expense.**

56.    The Near Insiders' principal motive for the Payment Scheme was to benefit themselves financially at Near's expense.  Although the Near Insiders and MobileFuse Insiders were introduced in 2019 and signed the contracts creating the Near-MobileFuse relationship in 2020, the Near Insiders and MobileFuse Insiders did not begin the Payment Scheme until after the Near Insiders acquired a 10% interest in MobileFuse in 2021.  The Sham Payments concealed cash infusions to MobileFuse and artificially inflated its revenues, thus increasing its purported value and the value of the Near Insiders' stake in MobileFuse.  Had MobileFuse been acquired or recapitalized during the Payment Scheme, the Near Insiders would have received a windfall.

57.    Moreover, MobileFuse paid distributions to its owners—including the Near Insiders—during the Payment Scheme.  The Sham Payments freed up MobileFuse cash to pay these distributions.  For example, the Sham Payments in June 2023 helped MobileFuse pay a distribution of $303,927.70 to Mathews on account of Uniqequity's ownership stake.

58.    Conversely, the Payment Scheme deprived Near of tens of millions of dollars in cash with no offsetting benefit.  Under the 2020 Usage Agreement and the 2022 Usage Agreement, Near should have received payments each year totaling $15 million and $18 million, respectively.  Instead, the Payment Scheme caused Near to receive, net of the Sham Payments, only $5.83 million of the $33 million owed (*i.e.*, 17.67%).

**F.     MobileFuse Shirks Millions of Dollars in Contractual Obligations.**

59.     The scheming between the Near Insiders and the MobileFuse Insiders began to unravel in 2023.  One reason was the Near Insiders' growing fear that, with Near becoming a publicly traded company in early 2023, there was a larger audience that might discover their personal investment in MobileFuse and Sham Payments.  The Near Insiders thus sold back their MobileFuse stake in July 2023, and the relationship between the Near Insiders and MobileFuse soured soon after.

60.     On August 15, 2023, Harlan emailed Mathews and Agarwal to give notice that MobileFuse was terminating the 2023 Usage Agreement.  Under the 2023 Usage Agreement's early termination provisions, (a) MobileFuse was required to give six months' notice before it could terminate; (b) during those six months, MobileFuse would still owe Near its pro rata share of the 2023 Usage Agreement's $18 million annual fee; and (c) after the termination went effective, MobileFuse would be "liable to pay a fixed fee equivalent to USD 250,000 for each remaining month from the date of termination till [January 1, 2025]."

61.     Harlan's email thus triggered a termination date of the 2023 Usage Agreement in February 2024 and obligated MobileFuse to owe Near (a) its pro rata share of the 2023 Usage Agreement's annual fee; and (b) ten months (*i.e.*, March 2024 – December 2024) of early termination fees (*i.e.*, $250,000 x 10 = $2.5 million).  In his email, Harlan acknowledged the 2023 Usage Agreement's early termination fee and said that "MobileFuse will clearly honor and pay the early termination fee as outlined in the agreement."

62.     When Harlan sent this email, MobileFuse had not paid Near any amounts owing under the 2023 Usage Agreement.  Thus, MobileFuse's pro rata share of the 2023 Usage Agreement's annual fee plus early termination fees equaled $23.5 million (*i.e.*, $18 million in

annual fees for 2023 + $3 million in pro rata annual fees for 2024 + $2.5 million in early termination fees).

63.     Harlan's email did not mention the 2022 Usage Agreement.  MobileFuse had made payments to Near NA for the minimum monthly fees under the 2022 Usage Agreement for January 2022 – August 2022, but MobileFuse still owed Near minimum monthly fees for September 2022 – December 2022 (*i.e.*, $1.5 million per month x 4 months = $6 million).

64.     The Payment Scheme was ultimately wound down in September 2023.  First, the Near Insiders and the MobileFuse Insiders made a set of payments, with the Near Insiders funneling two Sham Payments through MonFX to MobileFuse totaling $2,750,574.00, and MobileFuse immediately using those funds to pay $3 million to Near NA to cover its September and October monthly minimum fees owed under the 2022 Usage Agreement.  These payments left MobileFuse owing $3 million under the 2022 Usage Agreement (in addition to the debts created by receipt of the Sham Payments).

65.     Next, the Near Insiders agreed that MobileFuse could extinguish its $3 million remaining obligation under the 2022 Usage Agreement by paying Near only $1.5 million.  No explanation was ever provided for this 50% discount, and the news of this proposed agreement came shortly after a call between Harlan, Sessanta, Mathews, and Agarwal.  Under this purported "settlement" agreement (the "2023 Dues Settlement Agreement"), MobileFuse agreed to "initiat[e] a full and final payment of USD 1,500,000 . . . [to] clear[] all dues under the [2022 Usage] Agreement."

66.     As the last Sham Payment in their Payment Scheme, the Near Insiders sent $1,195,508.00 through MonFX to MobileFuse on September 28, 2023, and MobileFuse used those funds the next day to pay the $1.5 million owed under the 2023 Dues Settlement Agreement.  Thus,

instead of requiring MobileFuse to pay the $3 million owed under the 2022 Usage Agreement, the Near Insiders inexplicably agreed to accept 50 cents on the dollar for that debt and then covered MobileFuse's debt with Near's own cash.

67.    The 2023 Dues Settlement Agreement did not purport to extinguish amounts MobileFuse owed under the 2023 Usage Agreement, and MobileFuse made no payments towards that $23.5 million debt.

**G.    The Payment Scheme Is Discovered, and Near Collapses into Bankruptcy.**

68.    At the beginning of October 2023, Mathews, Agarwal, and Shukla were placed on leave by the Near's Board of Directors following an internal investigation.  That same investigation led Near Inc. to conclude and announce that Near's "previously issued financial statements . . . should not be relied upon, including Near's financial statements as of and for each of the years ended December 31, 2022, 2021, and 2020 as well as [Near's] quarterly financial statements for the periods ended March 31, 2023 and June 30, 2023."  This conclusion was the result of a "preliminary assessment that certain revenue may have been overstated."

69.    On December 8, 2023, Near filed petitions for relief under chapter 11 of the Bankruptcy Code.  Near NA listed MobileFuse's Scheduled Claim as a nonpriority claim in its *Schedule of Assets and Liabilities for Near North America, Inc. (Case No. 23-11967)* [D.I. 120] in the amount of $724,730.42.

70.    Ultimately, MobileFuse reaped a windfall of over $50.7 million from (a) the Sham Payments it received and (b) not paying amounts due under the 2022 Usage Agreement and the 2023 Usage Agreement that it was contractually obligated to pay.  Conversely, Near was deprived of $50.7 million by virtue of the wrongful acts by the Near Insiders and MobileFuse.

**H.      Near Was Insolvent at All Relevant Times.**

71.      By no later than April 1, 2021, Near was insolvent.  By that date, Near Pte. did not have the ability to pay its debts as they became due and was inadequately capitalized.  Indeed, Near had suffered losses each year since its inception in 2012, and its total debt balance continued increasing from March 2018 to the Petition Date.  Its liabilities—and those of Near Pte., Near Holdco, Near Singapore, and Near Inc.—exceeded the fair value of its assets from April 2021 through Petition Date.

72.      According to its accounting records, Near did not achieve positive earnings before interest, taxes, depreciation, and amortization, or positive "EBITDA," during any period between April 2015 and the Petition Date.  Indeed, its last-twelve-months EBITDA dropped from negative $6.2 million in April 2016 to negative $32.9 million by July 2023.  Meanwhile, Near's total debt steadily increased from $3.5 million in April 2018 to more than $100 million by July 2023.

73.      By April 2021, Near's total enterprise value, accounting for the fair value of Near's assets, was negative $57.5 million.  Near's total debt balance of $11.6 million caused Near to have an equity value of negative $69.1 million.  That is, by April 2021, Near's liabilities exceeded the fair value of its assets by at least $69.1 million.  Near continued to remain roughly $70 million insolvent for the rest of 2021.

74.      By July 2022, Near's total enterprise value had dropped to negative $150 million, with Near's liabilities exceeding the fair value of its assets by approximately $180 million.  Near remained more than $100 million insolvent through the Petition Date.

75.      Also, from April 2021 onward, Near was generating—and expecting to generate—negative cumulative free cash flows, resulting in negative cash available for debt repayments.  More specifically, Near's cash shortfall from April 2021 until the Petition Date was never less than

$48.7 million, meaning that Near's operations were never able to generate enough cash during that period to fund its operations and service its debts as they came due.

76.     In short, Near was insolvent at all times relevant to this adversary proceeding.

## CAUSES OF ACTION

### COUNT I
**Avoidance of Constructively Fraudulent Transfers**
**Under 11 U.S.C. § 548(a)(1)(B)**

77.     The Trustee re-alleges the allegations set forth in the above paragraphs.

78.     Within two years before the Petition Date, Near made Sham Payments to MobileFuse totaling at least $19,394,846.00 (collectively, the "§ 548 Transfers"), as reflected in Table 1 above.  Specifically:

- On or around January 26, 2022, Near Pte. made a Sham Payment of $1,408,046.00;

- On or around September 29, 2022, Near Holdco made two Sham Payments totaling $2,845,136.00; and

- From February 6, 2023 to September 28, 2023, Near Singapore made Sham Payments totaling at least $15,141,664.00.

79.     None of the Near entities received reasonably equivalent value in exchange for these § 548 Transfers.  The value, if any, of data or services that MobileFuse actually provided to Near Pte., Near Holdco, and Near Singapore (collectively, the "Transferors") was, at most, far less than the millions of dollars comprising the § 548 Transfers.

80.     The Transferors made their respective § 548 Transfers while insolvent because the § 548 Transfers were made (a) at a time when the Transferors intended to incur, believed, or reasonably should have believed that they would incur debts beyond its ability to pay as they became due; (b) while the Transferors were engaged or about to engage in a business or a transaction for which their remaining assets were unreasonably small in relation to the business or

transaction; and/or (c) when the sum of each Transferor's respective debts was greater than the sum of its respective assets, at a fair valuation, and continued to be insolvent thereafter.

81.     The Trustee may therefore avoid the § 548 Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT II**
**Avoidance of Constructively Fraudulent Transfers**
**Under 11 U.S.C. § 544(b)(1)**

82.     The Trustee re-alleges the allegations set forth in the above paragraphs.

83.     Within four years before the Petition Date, Near made Sham Payments to MobileFuse totaling at least $25,669,906.00 (the "§ 544 Transfers"), as reflected in Table 1 above. Specifically,

- Between May 27, 2021 and January 26, 2022, Near Pte. transferred at least $7,683,106.00 in Sham Payments to MobileFuse;

- On or around September 29, 2022, Near Holdco transferred $2,845,136.00 in Sham Payments to MobileFuse; and

- From February 6, 2023 to September 28, 2023, Near Singapore transferred at least $15,141,664.00 in Sham Payments to MobileFuse.[4]

84.     None of the Transferors received reasonably equivalent value in exchange for the § 544 Transfers.  The value, if any, of data or services that MobileFuse actually provided to the Transferors was, at most, far less than the millions of dollars comprising the § 544 Transfers.

85.     The Transferors made their respective § 544 Transfers while insolvent because the § 544 Transfers were made (a) at a time when the Transferors intended to incur, believed, or reasonably should have believed that they would incur debts beyond its ability to pay as they became due; (b) while the Transferors were engaged or about to engage in a business or a transaction for which their remaining assets were unreasonably small in relation to the business or

---

[4] That is, the § 544 Transfers consist of the § 548 Transfers and the first five transfers listed in Table 1 above.

transaction; and/or (c) when the sum of each Transferor's respective debts was greater than the sum of its respective assets, at a fair valuation, and continued to be insolvent thereafter.

86. The § 544 Transfers were constructively fraudulent as to each Transferor's respective present and future creditors, as there is at least one unsecured creditor of each Transferor that both: (a) held an unsecured claim against that Transferor before or within a reasonable time after each of the § 544 Transfers were made; and (b) held an unsecured claim against the same Transferor or its successor-in-interest as of the Petition Date. For example, Amazon Web Services, Inc. ("AWS"), as well as other creditors, held unsecured claims against Near Pte. and Near Holdco on or soon after each's first § 544 Transfer and held unsecured claims against their successor in interest, Near LLC, as of the Petition Date (collectively, the "Near LLC Predicate Creditors"). Smaato, Inc. ("Smaato"), as well as other creditors, held unsecured claims against Near Singapore on or soon after its first § 544 Transfer and held unsecured claims against Near Singapore as of the Petition Date (collectively, the "Near Singapore Predicate Creditors," and together with the Near LLC Predicate Creditors and the Near Inc. Predicate Creditors (defined below), the "Near Predicate Creditors").

87. The Near Predicate Creditors, including AWS and Smaato, could have avoided the § 544 Transfers as of the Petition Date.

88. The Trustee may therefore avoid the § 544 Transfers pursuant to 11 U.S.C. § 544(b)(1) and other applicable law, including 6 Del. C. § 1304(a)(2).

**COUNT III**
**Avoidance of Intentionally Fraudulent Transfers**
**Under 11 U.S.C. § 548(a)(1)(A)**

89. Pleading further or in the alternative, the Trustee may also avoid the § 548 Transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

90. The Trustee re-alleges the allegations set forth in the above paragraphs.

91.    Within two years before the Petition Date, Near made the § 548 Transfers to MobileFuse totaling at least $19,394,846.00, as reflected in Table 1 above.  Specifically:

- On or around January 26, 2022, Near Pte. made a Sham Payment of $1,408,046.00;

- On or around September 29, 2022, Near Holdco made two Sham Payments totaling $2,845,136.00; and

- From February 6, 2023 to September 28, 2023, Near Singapore made Sham Payments totaling at least $15,141,664.00.

92.    The Transferors made the § 548 Transfers with the actual intent to hinder, delay, or defraud their present and future creditors.  The § 548 Transfers were made for less than reasonably equivalent value, while Near was insolvent, and to an insider, MobileFuse, in which the Near Insiders had an undisclosed 10% ownership stake and with whom the Near Insiders conspired to create, execute, and conceal the Payment Scheme.  The Transferors also concealed the § 548 Transfers via transfers through MonFX, phony invoices, and otherwise.  Moreover, the § 548 Transfers lacked any economic substance or rationale and deprived Near of approximately $19.4 million that would have otherwise been available to the Transferors' creditors.

93.    The Trustee may therefore avoid the § 548 Transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

### COUNT IV
**Avoidance of Intentionally Fraudulent Transfers**
**Under 11 U.S.C. § 544(b)(1)**

94.    Pleading further or in the alternative, the Trustee may also avoid the § 544 Transfers pursuant to 11 U.S.C. § 544(b)(1).

95.    The Trustee re-alleges the allegations set forth in the above paragraphs.

96.    Within four years before the Petition Date, Near made the § 544 Transfers to MobileFuse totaling $25,669,906.00, as reflected in Table 1 above.  Specifically:

- Between May 27, 2021 and January 26, 2022, Near Pte. transferred at least $7,683,106.00 in Sham Payments to MobileFuse;

- On or around September 29, 2022, Near Holdco transferred $2,845,136.00 in Sham Payments to MobileFuse; and

- From February 6, 2023 to September 28, 2023, Near Singapore transferred at least $15,141,664.00 in Sham Payments to MobileFuse.

97.    The Transferors made the § 544 Transfers with the actual intent to hinder, delay, or defraud their present and future creditors.  The § 544 Transfers were made for less than reasonably equivalent value, while Near was insolvent, and to an insider, MobileFuse, in which the Near Insiders had an undisclosed 10% ownership stake and with whom the Near Insiders conspired to create, execute, and conceal the Payment Scheme.  The § 544 Transfers were also concealed via transfers through MonFX, phony invoices, and otherwise.  Moreover, the § 544 Transfers lacked any economic substance or rationale and deprived Near of approximately $25.67 million that would have otherwise been available to the Transferors' creditors.

98.    The Trustee may therefore avoid the § 544 Transfers pursuant to 11 U.S.C. § 544(b)(1) and other applicable law, including 6 Del. C. § 1304(a)(1).

## COUNT V
### Recovery of Fraudulent Transfers
### Under 11 U.S.C. § 550(a)

99.    The Trustee re-alleges the allegations set forth in the above paragraphs.

100.    The § 548 Transfers and the § 544 Transfers (collectively, the "Fraudulent Transfers") are avoidable pursuant to 11 U.S.C. §§ 548(a)(1) and 544(b) (and other applicable law).

101.    The Trustee may therefore recover the value of the Fraudulent Transfers from MobileFuse as the initial transferee of those avoidable transfers pursuant to 11 U.S.C. § 550(a)(1).

## COUNT VI
### Avoidance of the 2023 Dues Settlement Agreement
### Under 11 U.S.C. §§ 548(a)(1)(A) & 550(a)

102.    The Trustee re-alleges the allegations set forth in the above paragraphs.

103.    On September 28, 2023, MobileFuse and the Near Insiders entered into the 2023 Dues Settlement Agreement, which purported to cancel a $3 million liability MobileFuse owed for valid services Near performed under the 2022 Usage Agreement.  The Near Insiders cancelled that liability with the actual intent to hinder, delay, or defraud Near's present and future creditors.  By agreeing to accept $1.5 million for the cancellation of a $3 million debt, the Near Insiders purposefully deprived Near Inc. of cash that would have otherwise been available to Near Inc.'s creditors.  Further, Near Inc. did not receive reasonably equivalent value in exchange for the purported debt cancellation memorialized in the 2023 Dues Settlement Agreement.  Indeed, Near Inc. received no value for that cancellation.

104.    Moreover, Near Inc. was insolvent on the date that MobileFuse and the Near Insiders entered into the 2023 Dues Settlement Agreement and thereafter, and the Near Insiders concealed the 2023 Dues Settlement Agreement from Near Inc.'s board of directors and other Near personnel.

105.    The Trustee may therefore avoid the 2023 Dues Settlement Agreement pursuant to 11 U.S.C. § 548(a)(1)(A).

106.    Further, to the extent that any value was transferred by Near Inc. to MobileFuse in connection with the 2023 Dues Settlement Agreement, the Trustee may recover such value under 11 U.S.C. § 550(a).

## COUNT VII
### Avoidance of the 2023 Dues Settlement Agreement
### Under 11 U.S.C. §§ 548(a)(1)(B) & 550(a)

107.    The Trustee re-alleges the allegations set forth in the above paragraphs.

108.    On September 28, 2023, MobileFuse and the Near Insiders entered into the 2023 Dues Settlement Agreement, which purported to cancel a $3 million liability MobileFuse owed for valid services Near performed under the 2022 Usage Agreement.  Near Inc. did not receive reasonably equivalent value in exchange for the purported debt cancellation memorialized in the 2023 Dues Settlement Agreement.  Indeed, Near Inc. received no value for that cancellation.

109.    Neither MobileFuse nor the Near Insiders intended for MobileFuse to provide reasonably equivalent value to Near Inc. for the purported cancellation of MobileFuse's debts under the 2022 Usage Agreement.  Moreover, Near Inc. was insolvent on the date that MobileFuse and the Near Insiders entered into the 2023 Dues Settlement Agreement and thereafter.

110.    Accordingly, the Trustee may avoid the 2023 Dues Settlement Agreement and its purported debt cancellation as constructively fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B).

111.    Further, to the extent that any value was transferred by Near Inc. to MobileFuse in connection with the 2023 Dues Settlement Agreement, the Trustee may recover such value under 11 U.S.C. § 550(a).

**COUNT VIII**
**Avoidance of the 2023 Dues Settlement Agreement**
**Under 11 U.S.C. §§ 544(b)(1) & 550(a)**

112.    The Trustee re-alleges the allegations set forth in the above paragraphs.

113.    As more fully alleged above, Near Inc. did not receive reasonably equivalent value in exchange for the purported debt cancellation memorialized in the 2023 Dues Settlement Agreement.  Neither MobileFuse nor the Near Insiders intended for MobileFuse to provide reasonably equivalent value to Near Inc. for the purported cancellation of MobileFuse's debt. Moreover, Near Inc. was insolvent on the dates that MobileFuse and the Near Insiders purported to cancel MobileFuse's debts and thereafter.

114.   The debt cancellation in the 2023 Dues Settlement Agreement was constructively fraudulent as to Near's present and future creditors because there was at least one unsecured creditor of Near Inc. that both: (a) held a claim against Near Inc. before the 2023 Dues Settlement Agreement was signed on September 28, 2023; and (b) held a claim against Near Inc. as of the Petition Date (the "Near Inc. Predicate Creditors").  The Near Inc. Predicate Creditors include, but are not limited to, FINRA and DOMO, Inc.

115.   Pleading further or in the alternative, the Near Insiders entered into the 2023 Dues Settlement Agreement and cancelled MobileFuse's liability with the actual intent to hinder, delay, or defraud Near's present and future creditors.  By agreeing to accept $1.5 million for the cancellation of a $3 million debt, the Near Insiders purposefully deprived Near Inc. of cash that would have otherwise been available to Near Inc.'s creditors.  Indeed, Near Inc. received no value for purported cancellation of MobileFuse's debt under the 2022 Usage Agreement.

116.   Moreover, the Near Insiders concealed the 2023 Dues Settlement Agreement from Near Inc.'s board of directors and other Near personnel.

117.   The Trustee may therefore avoid the 2023 Dues Settlement Agreement and its purported debt cancellation as a constructively fraudulent transfer pursuant to 11 U.S.C. § 544(b)(1) and other applicable law, including 6 Del. C. §§ 1304(a)(1) and 1304(a)(2).

118.   Further, to the extent that any value was transferred by Near Inc. to MobileFuse in connection with the debt cancellation in the 2023 Dues Settlement Agreement, the Trustee may recover such transfers under 11 U.S.C. § 550(a).

## COUNT IX
### Breach of the 2022 Usage Agreement

119.   The Trustee re-alleges the allegations set forth in the above paragraphs.

120.    Near Pte and MobileFuse entered into the 2022 Usage Agreement, pursuant to which Near Pte agreed to provide, and did provide, MobileFuse with certain services as specified under the agreement.

121.    The 2022 Usage Agreement required MobileFuse to pay Near Pte specified amounts in exchange for services that Near Pte provided.

122.    Near Pte provided MobileFuse the agreed-to services under 2022 Usage Agreement.

123.    MobileFuse breached the 2022 Usage Agreement by failing to pay Near Pte and its successors in interest, Near LLC and Near Inc., the full amount owed under the 2022 Usage Agreement.

124.    MobileFuse's breach of the 2022 Usage Agreement caused Near to suffer damages of at least $1.5 million.

**COUNT X**
**Breach of the 2023 Usage Agreement**

125.    The Trustee re-alleges the allegations set forth in the above paragraphs.

126.    Near NA and MobileFuse entered into the 2023 Usage Agreement, under which Near NA agreed to provide, and did provide, MobileFuse with certain services as specified under the agreement.

127.    The 2023 Usage Agreement required MobileFuse to pay Near NA specified amounts in exchange for the services that Near NA provided.

128.    Near NA provided MobileFuse the agreed-to services under the 2023 Usage Agreement.

129.    MobileFuse breached the 2023 Usage Agreement by failing to pay Near NA the full amount owed under the 2023 Usage Agreement.

130.   MobileFuse's breach of the 2023 Usage Agreement caused Near NA to suffer damages of at least $20.5 million.

## COUNT XI
**Unjust Enrichment**

131.   The Trustee re-alleges the allegations set forth in the above paragraphs.

132.   Pleading further or in the alternative, MobileFuse has been unjustly enriched by the Sham Payments, which MobileFuse received but was not entitled to keep.

133.   MobileFuse kept these payments without justification.

134.   MobileFuse also has been unjustly enriched by being provided with millions of dollars in services for which it did not pay.

135.   MobileFuse's non-payment for these services was without justification.

136.   Near has been impoverished as a result of MobileFuse's unjustifiably (a) receiving and keeping payments from Near, and (b) receiving free services from Near, with MobileFuse not entitled to either.

## COUNT XII
**Equitable Subordination**

137.   The Trustee re-alleges the allegations set forth in the above paragraphs.

138.   The Scheduled Claim lists Near NA as owing MobileFuse $724,730 for a nonpriority trade claim.

139.   MobileFuse engaged in the inequitable conduct alleged above with respect to Near.

140.   The inequitable conduct of MobileFuse not only injured Near and its creditors, but such conduct also conferred unfair advantages or benefits on MobileFuse.

141.   Equitable subordination of the Scheduled Claim is not inconsistent with the Bankruptcy Code and would redress underlying inequitable conduct that directly harmed Near and its creditors.

4897-8874-1755.1 19286.00001

142.    Accordingly, the Trustee requests that the Scheduled Claim be equitably subordinated to the claims of all other creditors pursuant to 11 U.S.C. § 510(c).

## COUNT XIII
### Objection to Claim

143.    The Trustee re-alleges the allegations set forth in the above paragraphs.

144.    The Scheduled Claim lists Near NA as owing MobileFuse $724,730 for a nonpriority trade claim.

145.    The Trustee hereby objects to the Scheduled Claim because: (a) the Scheduled Claim should be equitably subordinated pursuant to 11 U.S.C. § 510(c); and (b) the Scheduled Claim is subject to set off, recoupment, and/or withholding based upon the causes of action asserted against MobileFuse in this action pursuant to 11 U.S.C. § 502(b)(1) & (d) and other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against MobileFuse as follows:

a.    avoiding the Fraudulent Transfers under 11 U.S.C. §§ 544(b)(1) (and other applicable law) and 548(a)(1);

b.    awarding recovery (or other appropriate relief) in the amount of the Fraudulent Transfers under 11 U.S.C. § 550(a);

c.    avoiding the debt cancellation in the 2023 Dues Settlement Agreement under 11 U.S.C. §§ 544(b)(1) (and other applicable law) and 548(a)(1)(B);

d.    awarding monetary and compensatory damages on account of MobileFuse's breaches of contract in an amount to be determined at trial;

e.    imposing a constructive trust against MobileFuse in favor of the Trustee for the claims set forth herein;

f.    subordinating or disallowing the Scheduled Claim under 11 U.S.C. §§ 502(b)(1), 502(d), and 510(c);

g.     awarding reasonable attorney's fees, expenses, and costs incurred by the Trustee in connection with this action;

h.     awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity; and

i.     granting such other relief as the Court deems just and proper.


Dated: November 18, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Bradford J. Sandler*
Bradford J. Sandler (DE Bar No. 4142)
Beth E. Levine (*pro hac vice*)
Peter J. Keane (DE Bar No. 5503)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
T: (302) 652-4100
F: (302) 652-4400
bsandler@pszjlaw.com
blevine@pszjlaw.com
pkeane@pszjlaw.com

-and-

**REID COLLINS & TSAI LLP**

Eric D. Madden (*pro hac vice*)
Brandon V. Lewis (*pro hac vice*)
Brian J. Bah (*pro hac vice*)
1601 Elm Street, Suite 4200
Dallas, TX 75201
T: (214) 420-8900
F: (214) 420-8909
emadden@reidcollins.com
blewis@reidcollins.com
bbah@reidcollins.com

*Counsel for the Trustee*
