**<u>Exhibit C</u>**

**2023 Usage Agreement**



# NEAR PLATFORM USAGE AGREEMENT

This Near Platform Usage Agreement ("**Agreement**"), is entered into as of 1st day of January 2023 (the "**Effective Date**") between **Near North America Inc.,** having its office address at 100 W Walnut Street, STE A-4, Pasadena, CA 91124 USA ("**Company**" or "**Near**") and **MobileFuse, LLC**, including itself and all its affiliates, having its office address at PO Box 37, Stirling NJ 07980 ("**Customer**"). The Agreement and shall be governed by the terms highlighted under Appendix A ("**Terms of Use**"). This Agreement and the Terms of Use are together referred to as "**T&C's**" and supersedes all previous agreements entered in-between the parties including its affiliates. In case of any inconsistencies between this Agreement and the Terms of Use, the terms of this Agreement will prevail.

The T&C's set forth the terms of use of Allspark (*defined below*) and Targeting Platform (*defined below*). By executing this Agreement, Customer represents that its authorised signatory has the authority to bind the Customer to the T&C's. The Customer's access to and use of Allspark and Targeting Platform constitutes the Customer's irrevocable acceptance to the T&C's, which establishes a contractual relationship between the Company and the Customer. The T&C's expressly supersede any oral or written prior agreements or arrangements between the Company and the Customer.

## 1.    DEFINITIONS

"**Allspark**" means a mobile-first audience cloud powered, proprietary data management and analytics platform that allows its customers to leverage multiple streams of data (including location, behavioral, demographic, interest and third party data) by permitting them to curate audience, target audience in real-time, in and around hand-picked locations, track exposure to store visits and attribution for conversion tracking and provides real-time insights and heat maps of curated and standard off-the-shelf audience.

"**AudienceCard**" means selection of different segments of the Company Data, by the Customer, to build an audience segment in Allspark.

"**Customer**" means the customer defined above and includes its assignees, affiliates, agents, successors and legal representatives.



"**Company Data**" means the aggregated and analyzed data, derived as an output from Allspark, specifically for the Customer. The Company Data includes aggregated and analyzed consumer locations without use of GPS along with user behavior and context to build audiences/segments.

"**Compass**" means Near's attribution and measurement platform.

"**DMP**" means a Data Management Platform, which is a platform used to store and analyse Device IDs or other hashed Device IDs or cookies or some kind of identifiers, to allow the clients to better understand the data. DMP platform is usually connected and interacts with DSP.

"**DSP**" means a Demand Side Platform, which is a programmatic platform used to define buying criteria and which facilities the serving of digital advertising onto publisher and mobile sites, apps.

"**Engage**" means Near's in-house DSP.

"**Marketing Material(s)**" means creative, artwork, copy, or active URLs of advertisement provided or approved by the Customer to the Company for providing marketing solution.

"**Places**" means place segments used in building a custom AudienceCard in Allspark.

"**Services**" means providing access to Allspark for (i) creating AudienceCard and (ii) running queries and displaying Marketing Materials through Targeting Platform. A detailed description of the Services and the agreed SLAs have been included under Addendum 1 of this Agreement.

"**Targeting Platform**" means the platform that interfaces with the Publisher Platform to enable the Company to serve/display Marketing Materials on the Publisher Platform.

"**Territory**" means the United States of America, Canada, and their territories and possessions.

*(Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Terms of Use)*

## 2.    EXCLUSIVE PARTNER

The Company agrees to appoint the Customer as the exclusive partner for supplying Company's advertising products, including Allspark, Engage and Compass in the territory of United States of America and Canada. Customer acknowledges that the exclusive partner relationship will be restricted to specific named account list (as mutually agreed between the parties from time to time and changes to such named account list cannot be made without mutual agreement) related to the



advertising business and no other use-case of Near's product. As part of this arrangement, the Customer agrees to pay Fee set out in Exhibit A (*Fees*).

## 3. USAGE AND RESTRICTIONS

Subject to compliance with the T&C's and payment of applicable fees by Customer, the Company hereby grants the Customer a license to use the Allspark, Targeting Platform, and Compass for the Services described herein (the "**License**") on the following terms: (a) the License is for the terms specified in this Agreement and for duration of the Term only; (b) the License is non-revocable except as otherwise provided in Section 5 of this Agreement or the provisions of the Terms of Use; and (c) the License is non-transferable. All rights not expressly granted herein are reserved by the Company and its licensors. The Company may create a white-labelled version of Allspark for the specific use of the Customer with the Customer's branding and collaterals upon mutual consent of the parties. The list of countries for which Allspark will be made available to the Customer includes the United States of America and Canada. Further territories may be added with mutual consent of both parties and upon agreement of the commercial terms for such additional territories.

The Company Data is based upon data which is provided by third parties, the accuracy and/or completeness of which would not be possible and/or economically viable for Company to guarantee. Services also involve models and techniques based on aggregate statistical analysis, probability and predictive behaviour. Company is therefore not liable for any inaccuracy, incompleteness or other error in the Services and any failure of the Company Data to achieve any particular result for the Customer.

## 4. FEES & PAYMENTS

The Company will invoice the Customer, in arrears, for usage of Allspark and Engage on a monthly basis ("**Fee(s)**"). Invoices for Fee(s) will be sent to the Customer every month, in arrears. Invoices will be sent to Customer's email address provided by the Customer. Payment shall be made in full within ninety (90) days of the date of invoice.

All Fee(s) above are exclusive of any indirect taxes and the Customer shall be solely responsible for paying all applicable taxes which may be levied or assessed in connection with the Services provided under this Agreement. To the extent that Customer is required to withhold any applicable taxes (including income tax) in connection with this Agreement, the Customer will gross up the payment owed to the Company such that Company shall receive the same amount as if such taxes had not applied. Each party is responsible for their own income taxes.



In the event audience data segments are sold through a third party, for example a DSP or DMP, wherein monies are paid directly to the Company as the supplier, the Company must reconcile and pay any net fees directly to the Customer.

## 5.    TERM & TERMINATION

The T&C's will commence on the Effective Date and shall be valid for a period of 2 (two) years from the Effective Date ("**Initial Term**"). The T&C's will automatically renew for successive periods of 1 (one) year each ("**Renewal Term**") unless either party provides the other party with written notice of at least 180 (one-hundred and eighty) days' prior to the expiry of the Initial Term or subsequent Renewal Term, that this Agreement shall not be renewed. During the Term, either party may terminate this Agreement with six (6) months prior written notice to the other party. The Initial Term and the Renewal Term shall hereinafter be collectively referred to as the "**Term**".

This Agreement may be terminated by the Company or the Customer in the event of a material breach of this Agreement by the other party, and such material breach continuing for a period of ten (10) days after written notice to the breaching party of such breach.  Under such circumstances, the Customer will not owe future fees from such date.

At any point during the Initial Term, if the Customer terminates this agreement for any reason, the Customer will be liable to pay a fixed fees equivalent to USD 250,000 for each remaining month from the date of termination till the end of the Initial Term. For example, if the agreement is terminated on 30-June-2023 and the Initial Term ends on 31-Dec-2024, the Customer will be liable to pay USD 250,000 per month for the remaining 18 months of the agreement resulting in a terminate fee payment of USD 4,500,000.  If the Customer elects to terminate, the Customer can choose to pay a one-time fee of USD 4,000,000 instead of the USD 250,000 monthly payments.

## 6.    OTHER TERMS AND CONDITIONS

(a)    *SLA:* The Company will provide a minimum service level as mutually agreed between the parties. If the SLA is not met at any time during the term of the Agreement, the Customer will have the option to terminate the Agreement immediately.

(b)    *Ownership*: By signing this Agreement, the Customer irrevocably acknowledges that the Customer has no ownership interest in the Company Data and Services. Subject to any limitations associated with intellectual property rights of third parties, the Company shall own all right, title, and interest in Company Data and Services, data developed in the performance of the Services (including such derivative works so developed under this Agreement jointly with any client or partner or solely by the



Company).  The Customer will own data which has been imported and stored by the Customer and then enriched or modified by the Company.

(c)    *Confidentiality and Non-Disparagement*: Each Party agrees to keep the terms and conditions of this Agreement confidential to the extent allowed by law. Each Party also agrees to keep confidential any and all discussions, communications and documents relating to the issues and negotiations that led to this Agreement and the underlying facts, allegations, documents and communications related to any claims made during the negotiation of the Agreement and any previous Agreement. Each Party further agrees not to talk about or otherwise communicate to any third parties in a malicious, disparaging, or defamatory manner regarding the other Party. Each Party agrees to refrain from any disparagement, defamation, libel, or slander of any of the terms of the Agreement, and agrees to refrain from any tortious interference with the contracts. Customer agrees not to disparage the Company, and the Company's officers, directors, employees, shareholders and agents, in any manner likely to be harmful to them or their business, business reputations or personal reputations. Likewise, the Company agrees to direct its officers and directors not to disparage the Customer in any manner likely to be harmful to its personal or business reputations or relationships.

**IN WITNESS WHEREOF,** the parties hereto have understood, agreed to and caused this Agreement to be executed in duplicate originals by their duly authorized representatives as of the latest date of signature by the parties.

**NEAR NORTH AMERICA INC.**                    **CUSTOMER**

DocuSigned by:                                 DocuSigned by:

*Anil Mathews*                                 *ken Harlan*

CB8331D8FC4946B...                             CEE344EFE94A437...

Name: Anil Mathews                             Name: Kenneth Harlan

Title: Founder & CEO                           Title: Founder & CEO



## EXHIBIT A
## FEES

The Customer shall pay the Company the following Fee(s) for access to and use of the Allspark platform and running campaigns through Engage. The Fees may only be changed or increased during the Term with the written consent of both Customer and Company.

| Particulars | Details | Preferred Rate for the Customer (USD) |
| --- | --- | --- |
| Annual Minimum Fees | Amount of gross spends which the Customer will be running through Allspark, Engage and Compass | USD 18 Million per year |
| Monthly Variable Fees | Additional Usage Fees | • 2.5% for spends on the platform between US$1m – 2m per month; or<br>• 5.0% for spends on the platform between US$2m – 3m per month; or<br>• 7.5% for spends on the platform above US$3m |

The annual minimum fees commitment of USD 18 million will include service fees relating to:
- Unlimited access to the Allspark platform giving access to unlimited Places and Audience Cards (valued worth USD 4 million annually)
- Service Fees for running marketing and insights engagements on Near's platform as agreed mutually between the parties from time to time



# APPENDIX A

## NEAR PLATFORM TERMS OF USE

These Near Platform Terms of Use (**"Terms of Use"**), together with any applicable additional terms signed by the parties (if any), set forth the legally binding terms and conditions for Your use of the Near Platform and Services (as defined below) and constitute the entire agreement between Near Intelligence Holdings Inc. (**"Company"**) and the corporate entity, LLP, corporation, LLC, partnership, sole proprietorship, or other business entity using the Near Platform and Services (**"Customer"** or **"You"**). Please read these Terms of Use carefully before using the Near Platform and Services.

1. Definitions

The following capitalized terms will have the following meanings whenever used in these Terms of Use:

- **"Aggregate Data"** refers to the aggregated and anonymised data derived from the Customer Data, including by removal of Personal Data (to the extent such Customer Data contains any Personal Data);
- **"Company Associates"** means Company's officers, directors, shareholders, parents, subsidiaries, agents, successors, and assigns;
- **"Custom Data"** means the aggregated dataset created and customized from existing Company Data based on specifications agreed under the Data Usage Agreement, for the Customer;
- **"Customer Data"** means any data provided by Customer to the Company to be used in Near Platform, or any data received by or on behalf of Company from the Customer Sites, wherein reference to Customer includes, without limitation, Customer's Users;
- **"Customer Site"** means the website, application or other digital media owned and/or operated by Customer, in relation to which Company is providing Services to Customer;
- **"Data Usage Agreement"** means the 'Near Platform Usage Agreement' or any other agreement with a similar title executed by and between Company and Customer, and which is governed by these Terms of Use;
- **"Digital Application"** means the application software designed to run on a mobile device, such as a smartphone, tablet computer or any other digital mobile device;
- **"Documentation"** means Company's standard user documentation and instructions related to use of the Near Platform;
- **"Fees"** shall have the meaning as ascribed to the term in the Data Usage Agreement;
- **"Near Platform"** means a mobile-first audience cloud powered, proprietary data management and analytics platform that allows its customers to leverage multiple streams of data (including location, behavioural, demographic, interest and third party data) by permitting them to curate audience, target audience in real-time, in and around hand-picked



- locations, track exposure to store visits and attribution for conversion tracking and provides real-time insights and heat maps of curated and standard off-the-shelf audience, as well as calculates the efficacy of digital campaigns (through an independent offline attribution product) in terms of visits to the brick and mortar locations of interest (including stores). Near Platform includes the Company's flagship product offerings, i.e. Allspark, Carbon and Compass;
- **"Personal Data"** means any information relating to an identified or identifiable natural person (**"data subject"**); an **"identifiable natural person"** being one who can be identified, directly or indirectly by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person. Personal Data includes PII;
- **"Personally Identifiable Information"** or **"PII"** means any (i) personally identifiable information related to a data subject; (ii) social security number with the associated name; (iii) mother's maiden name with the associated name; (iv) driver's license or other government issued identification card numbers with the associated name; (v) telephone numbers identified as unlisted or unpublished; (vi) credit card, debit card or financial account numbers with the associated name and any required PIN or access code; (vii) personally identifiable health information; (viii) personally identifiable payroll/financial information including employee identification numbers; or (ix) any non-public personal information, as that term is known under the applicable privacy and data protection laws and/or regulations;
- **"Privacy Policy"** means Company's privacy policy, currently posted at https://near.com/privacy/;
- **"Publisher Platform"** means the Digital Application on which Company has a right to serve advertisements;
- **"Services"** shall have the meaning as ascribed to the term in the Data Usage Agreement;
- **"Term"** shall have the meaning as ascribed to the term in the Agreement;
- **"User"** means any individual who uses the Near Platform and/or Services on Customer's behalf or through Customer's account or passwords, whether authorized or not.

2. [Intentionally Omitted]
3. Usage And Restrictions
- Subject to compliance with these Terms of Use and upon payment of applicable fees by Customer, Company hereby grants the Customer a fixed-term, exclusive (as set out in the Agreement), revocable, non-transferable access to the Near Platform and Company Data for the purpose of availing the Services described herein. All rights not expressly granted herein are reserved by the Company and/or its licensors.
- Customer acknowledges that Company Data is based upon data which is provided by third parties, the accuracy and/or completeness of which would not be possible and/or economically viable for Company to guarantee. Services involve models and techniques based on aggregate statistical analysis, probability and predictive behavior. Company is therefore not able to accept any liability for any inaccuracy, incompleteness or other error in the Services and any failure of Company Data to achieve any particular result for the



Customer, other than the specifications for Services already mentioned in the Data Usage Agreement.

- Company will use commercially reasonable security technologies in providing Services and Customer shall comply with the applicable security policies of Company made known to Customer. However, Company does not control the transfer of data, including but not limited to Custom Data, over telecommunications facilities, including the Internet, and Customer acknowledges and agrees that Company shall have no responsibility for any computer viruses, worms, software bombs, bugs or similar items that affect the Customer's computers, computer systems, software, infrastructure or data as a result of the Customer's access to or use of Services.
- Company shall put all reasonable efforts in accordance with industry standards to make the Services available at all times. However, Customer acknowledges and agrees that (i) nothing in these Terms of Use guarantees that the Services will be free from interruption or errors, (ii) there will be periods when the Services are unavailable and cannot be accessed and (iii) Company accepts no liability for any loss or damage that Customer may suffer or incur as a result of such unavailability at any time.
- Acceptable Use. Customer shall not:
  - license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party access to Near Platform in any way;
  - copy, translate, decompile, reverse-engineer or otherwise modify any parts of Near Platform (including Company Data) or modify or make derivative works based upon the Services offered;
  - create Internet **"links"** to Near Platform or **"frame"** or **"mirror"** Near Platform on any other server or wireless or Internet-based device;
  - interfere with or disrupt Company's systems used to host the Company Data, other equipment or networks connected to Company Data, or disobey any requirements, procedures, policies or regulations of networks accessed;
  - circumvent the user authentication/login provided;
  - share non-public features or content of the Near Platform and/or the Services with any third party;
  - use the Near Platform for service bureau or time-sharing purposes or in any other way allow third parties to exploit the Near Platform;
  - access Near Platform in order to (a) build a competitive product or service, (b) build a product using similar ideas, features, functions or graphics as the Near Platform, or (c) copy any codes, ideas, features, functions or graphics of Near Platform;
  - engage in web scraping or data scraping on or related to the Near Platform, including without limitation collection of information through any software that simulates human activity or any bot or web crawler;
  - except for access provided to Customer as permitted in these Terms of Use, allow any third party to use any user identification(s), code(s), password(s) or other log-in



information of the Near Platform, procedure(s) and user keys issued to, or selected by Customer to access Near Platform.

- Unauthorized Access. In the event Company suspects any breach of the requirements of Section 3.5 above, including without limitation by Users, Company may suspend Customer's access to the Near Platform and/or Services without advanced notice, in addition to such other remedies that Company may have. Customer shall notify Company immediately of any known or suspected unauthorized use of the Near Platform or breach of its security and shall use best efforts to stop the said breach.

- Compliance with Laws. In its use of the Near Platform and/or Services, Customer shall comply with all applicable laws, including without limitation laws governing the protection of Personal Data and other laws applicable to the protection of Customer Data.

- Access by Users. Customer is responsible and liable for: (a) Users' use of the Near Platform and/or Services, including without limitation unauthorized conduct of the User and/or any User conduct that would violate the requirements under these Terms of Use applicable to Customer; and (b) any use of the Near Platform and/or Services through Customer's account, whether authorized or unauthorized.

- The Customer is not relieved of any of its liabilities or obligations under these Terms of Use due to the fact that the Customer engages the services of a third party and in so far as the acts, omissions, defaults and neglects of the Customer or any employee or agent of the Customer results in a breach of the Customer's obligations under these Terms of Use.

4. Intellectual Property Rights

- Customer acknowledges that it has no ownership rights in the Near Platform (including without limitation, all software used to provide the Near Platform and all graphics, user interfaces, logos, and trademarks reproduced through the Near Platform), Company Data, Custom Data and the Services. Subject to any limitations associated with intellectual property rights of third parties, Company (and/or its licensors, where applicable) shall retain sole and exclusive ownership in any and all patent rights, copyrights, trademark rights and other intellectual property rights in the Company Data, Custom Data and the Services, as well as any enhancements, changes, revisions, modifications, design contributions or derivative works conceived, made or created to the same, including the know-how, techniques, or procedures acquired or used by Company. Except for the licenses described herein, nothing herein shall be construed to assign or transfer any intellectual property rights to the Customer. Customer shall not remove notices and notations on Company Data that refer to copyrights, trademark rights, patent rights and other intellectual property rights.

- All suggestions, solutions, improvements, corrections, and other contributions for improving or otherwise modifying any of Company's products or services (**"Feedback"**) provided by Customer regarding the Near Platform, Company Data, Custom Data or the Services shall be owned by Company, and Customer hereby agrees to assign all rights in such Feedback to the Company. Nothing in this Agreement will restrict Company's right to use, profit from, disclose, publish, keep secret, or otherwise exploit the Feedback, without compensating or crediting Customer or the User in question. Notwithstanding anything to the contrary, Feedback will not be considered as Confidential Information.



- Customer owns and retains all right, title and interest (including without limitation, all intellectual property rights) in and to the Customer Data and any updates or modifications to the foregoing, unless expressly agreed otherwise between Company and Customer. In case the Customer shares any Customer Data on Near Platform or requires Company to use any Customer Data in combination with Company Data or Custom Data, or in any other manner required for provision of the Services, Customer grants to Company the non-exclusive, fully paid-up, royalty free, worldwide, irrevocable, perpetual right and license to use the Customer Data in the Near Platform for the purpose of provision of the Services and to further modify, compile, store, validate, integrate, normalise, aggregate, sort, manipulate, analyse, combine with other third party data and create derivative works of the Customer Data for the purpose of Company's provision of the Services and to further improve and optimise the Near Platform and Services. For clarity, the foregoing license grant to Company does not affect Customer's other ownership or license rights in the Customer Data, unless otherwise agreed in writing with Company. Customer represents and warrants that it has all rights to grant such license to Company without infringement or violation of any third-party rights, including without limitation, any privacy rights, publicity rights, copyrights, contract rights, or any other intellectual property or proprietary rights.

5. Representations and Warranties
    - From Company. Company represents and warrants that it is the owner of the Near Platform and the components thereof, or the recipient of a valid license thereto, and that it has and will maintain the full power and authority to grant the rights to use the Near Platform as set forth in these Terms of Use without the further consent of any third party. Company's representations and warranties in the preceding sentence do not apply to the extent that the infringement arises out of any of the conditions listed in Sub-sections 6.3(a) through 6.3(c) below. In the event of a breach of the warranty in this Section 5.1, Company, at its own expense, shall promptly take the following actions: (i) secure for Customer the right to continue using the Near Platform; (ii) modify the Near Platform to make it non-infringing; or (iii) terminate the infringing features of the Near Platform, and refund to Customer any prepaid fees for such features, in proportion to the portion of the Term left after such termination, in which case Customer shall cease all use of the affected Services and erase any copies of Company Data in relation thereto. In conjunction with Customer's right to terminate for breach, where applicable, the preceding sentence states Company's sole obligation and liability, and Customer's sole and exclusive remedy, for breach of the warranty in this Section 5.1 and for potential or actual intellectual property infringement by the Near Platform.
    - From Customer. Customer represents and warrants that:
        - it has the full right and authority to enter into, execute, and perform its obligations under the Data Usage Agreement and these Terms of Use;
        - it is a corporation, the sole proprietorship of an individual 18 years or older, or another entity authorized to do business pursuant to applicable law;
    - EXCEPT AS OTHERWISE SET FORTH HEREIN, CUSTOMER ACCEPTS THE COMPANY DATA, CUSTOM DATA, NEAR PLATFORM AND ANY OTHER



SERVICES PROVIDED BY COMPANY **"AS IS"** AND AS AVAILABLE, WITH NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS, OR ANY IMPLIED WARRANTY ARISING FROM STATUTE, COURSE OF DEALING, COURSE OF PERFORMANCE, OR USAGE OF TRADE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING: (a) COMPANY DOES NOT REPRESENT OR WARRANT THAT THE NEAR PLATFORM WILL PERFORM WITHOUT INTERRUPTION OR ERROR; AND (b) COMPANY DOES NOT REPRESENT OR WARRANT THAT THE NEAR PLATFORM IS SECURE FROM HACKING OR OTHER UNAUTHORIZED INTRUSION.

6. Reserved

7. Limitation of Liability

- COMPANY'S CUMULATIVE LIABILTY FOR ALL CLAIMS ARISING OUT OF OR RELATED TO THESE Terms of Use WILL NOT EXCEED THE FEES PAID BY THE CUSTOMER TO THE COMPANY, UNDER THE DATA USAGE AGREEMENT, DURING THE TWELVE (12) MONTHS PERIOD, PRIOR TO THE DATE THE LIABILITY FIRST AROSE, NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY.
- IN NO EVENT WILL COMPANY BE LIABLE FOR LOST PROFITS OR LOSS OF BUSINESS OR FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES.
- THE LIABILITIES LIMITED BY THIS SECTION 7 APPLY: (a) TO LIABILITY FOR NEGLIGENCE; (b) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY, OR OTHERWISE; (c) EVEN IF COMPANY IS ADVISED IN ADVANCE OF THE POSSIBILITY OF THE DAMAGES IN QUESTION AND EVEN IF SUCH DAMAGES WERE FORESEEABLE; AND (d) EVEN IF CUSTOMER'S REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.
- IF APPLICABLE LAW LIMITS THE APPLICATION OF THE PROVISIONS OF THIS SECTION 7, COMPANY'S LIABILITY WILL BE LIMITED TO THE MAXIMUM EXTENT PERMISSIBLE. FOR THE AVOIDANCE OF DOUBT, COMPANY'S LIABILITY LIMITS AND OTHER RIGHTS SET FORTH IN THIS SECTION 7 APPLY LIKEWISE TO COMPANY'S AFFILIATES, LICENSORS, SUPPLIERS, AGENTS, SPONSORS, DIRECTORS, OFFICERS, EMPLOYEES, CONSULTANTS, AND OTHER REPRESENTATIVES.

8. Confidentiality

- Confidential Information. **"Confidential Information"** refers to the following items that either Party (**"Disclosing Party"**) discloses to the other Party (**"Receiving Party"**): (a) any document that the Disclosing Party marks as **"Confidential"**; (b) any information that the Disclosing Party orally designates as **"Confidential"** at the time of disclosure, provided the Disclosing Party confirms such designation in writing within fifteen (15) business days; (c) the Documentation and Customer Data, whether or not marked or designated as

DocuSign Envelope ID: 10F14843-3B03-41AC-B3B2-6285040E7786



confidential; and (d) any other non-public, sensitive information that the Receiving Party should reasonably consider a trade secret or otherwise confidential. Notwithstanding the foregoing, Confidential Information does not include information that: (i) is in the Receiving Party's possession at the time of disclosure; (ii) is independently developed by the Receiving Party without use of or reference to Confidential Information; (iii) becomes known publicly, before or after disclosure, other than as a result of the Receiving Party's improper action or inaction; (iv) has been disclosed to the Receiving Party by a third party who, to the Receiving Party's knowledge, has the right to disclose such information without restriction; or (v) is approved for release in writing by the Disclosing Party. Customer is on notice that the Confidential Information may include Company's valuable trade secrets.

- Non-disclosure. Receiving Party shall not use the Disclosing Party's Confidential Information for any purpose other than for the purpose of providing the Services (in case of Company) or availing the Services (in case of Customer) in accordance with these Terms of Use (the **"Purpose"**). The Receiving Party: (a) shall not disclose the Confidential Information to any of its employee or contractor unless such person needs access in order to facilitate the Purpose and executes a non-disclosure agreement with the Receiving Party with terms no less restrictive than those of this Section 8; and (b) shall not disclose Confidential Information to any other third party without the Disclosing Party's prior written consent. Without limiting the generality of the foregoing, Receiving Party shall protect Confidential Information with the same degree of care it uses to protect its own confidential information of similar nature and importance, but with no less than reasonable care. Receiving Party shall promptly notify the Disclosing Party of any misuse or misappropriation of Confidential Information that comes to the Receiving Party's attention. Notwithstanding the foregoing, Receiving Party may disclose Confidential Information as required by applicable law or by proper legal or governmental authority. Receiving Party shall give the Disclosing Party prompt notice of any such legal or governmental demand and reasonably cooperate with Disclosing Party in any effort to seek a protective order or otherwise to contest such required disclosure, at the Disclosing Party's expense.
- Injunction. Receiving Party agrees that a breach of this Section 8 would cause irreparable injury to the Disclosing Party, for which monetary damages may not provide adequate compensation, and that in addition to any other remedy, the Disclosing Party will be entitled to seek injunctive relief against such breach or threatened breach, without proving actual damage or posting a bond or other security.
- Termination & Return. With respect to each item of Confidential Information, the obligations of Non-disclosure set out in this section will terminate three (3) years following the date of expiry or termination of the Terms of Use; provided that such obligations related to Confidential Information constituting Disclosing Party's trade secrets will continue so long as such information remains subject to trade secret protection pursuant to applicable law. Upon termination of the Data Usage Agreement, Disclosing Party shall return all copies of Confidential Information to the Receiving Party or certify, in writing, the destruction thereof.



- Retention of Rights. These Terms of Use do not transfer ownership of Confidential Information or grant a license thereto. Disclosing Party will retain all right, title, and interest in and to all Confidential Information.

9. Data Privacy

- Customer agrees and acknowledges that the Company does not require any Personal Data, for the provision of Services. Customer shall ensure that it reviews all Customer Data provided to Company and scrub any Personal Data from the same before providing it to the Company. In the event Customer determines that disclosure of Personal Data is crucial, for the performance of Company's obligations hereunder, Customer shall provide Company with a prior written notice of Customer's intention to disclose Personal Data. Such data shall be disclosed by Customer upon Company's written acceptance of such notice and subject to any documentation that the Company requires the Customer to execute.

- Customer warrants that it will not use Company Data in combination with any third-party data that may lead to identification or disclosure of Personal Data.

- In case the Customer Data contains any Personal Data, or the Customer otherwise discloses Personal Data to the Company, the Customer represents and warrants that: (i) it complies with all applicable data protection laws in respect of processing (as defined in the applicable data protection laws) of such Personal Data; and (ii) it will always have explicit consents from the respective data subjects whose Personal Data is shared in respect of the following:
  o sharing such Personal Data with the Company;
  o the Company's processing of such Personal Data for data enrichment activity within the Near Platform, which includes, but is not limited to, identifying the behaviour of such data subjects and profiling them based on their physical/digital world behaviour to create an enriched dataset from such Personal Data (**"Enriched Data"**);
  o sharing of such Enriched Data by the Company with the Customer.

- Privacy Policy. By using the Services, Customer consents to Company's collection, use, and disclosure of Customer Data. Company's Privacy Policy contains information about how Company collects, uses and discloses Customer Data. The Privacy Policy applies only to the Near Platform and does not apply to any third-party website or service linked to the Near Platform or recommended or referred to through the Near Platform.

10. Customer Data

- Customer Data. All Customer Data is the sole responsibility of the Customer. Company cannot guarantee the authenticity of any Customer Data. Company may use the Customer Data in various ways in connection with the provision of Services and the Near Platform as Company may determine in its sole discretion, including but not limited to, creating derivative works from the Customer Data (including by creating Aggregate Data therefrom). Company shall have the right to use Aggregate Data in an anonymous manner for the Near Platform. Customer understands that all Customer Data transmitted through the Near Platform is the sole responsibility of the Customer; that Company will not be liable for any errors or omissions in any Customer Data. Company will have no responsibility or liability for the accuracy of data uploaded to the Near Platform by or

DocuSign Envelope ID: 10F14843-3B03-41AC-B3B2-6285040E7786



> under the instructions of the Customer, including without limitation Customer Data and any other data uploaded by Users.

- Risk of Exposure. Customer recognizes and agrees that hosting data online involves risks of unauthorized disclosure or exposure that arise out of factors not in reasonable control of Company and that, in accessing and using the Near Platform, Customer assumes such risks. Company offers no representation, warranty, or guarantee that Customer Data will not be exposed or disclosed through errors or the actions of third parties.

11. Insurance
- Without prejudice to its obligations under these Terms of Use, the Customer shall affect and maintain, commercial general liability insurance policy with a limit of USD five (5) million, with a reputable insurance company. Upon receipt of a written request from Company, the Customer shall submit a certificate to confirm that Customer maintains the required insurance policy with a reputable insurance company.

12. Compliance Audit
- Customer shall maintain accurate records of its use of the Near Platform and Company Data throughout the Term.
- In the event any third party (including person or entity/authority) authorised under applicable law requests Company for information/data or audits Company's records in respect of Custom Data or Customer's use of Company Data (**"Third Party Request"**), Customer shall permit Company or an independent third-party auditor approved by Company to inspect and audit Customer's records pertaining to the scope of such Third Party Request. The audit rights provided herein shall be valid for the Term and a period of six (6) months thereafter.
- Such audits shall be conducted at Company's sole expense. All audits conducted under this Section will be subject to the following requirements: (i) Company shall provide two (2) business days' notice to Customer before such audit; and (ii) any such inspection and audit shall be conducted during regular business hours of Customer in such a manner as to not interfere with normal business activities of Customer.
- Customer shall, at its own expense, promptly correct any non-compliance detected by such audit, but not exceeding (i) fifteen (15) days from the release of such audit results identifying such non-compliance; or (ii) the period as may be required under applicable law, whichever is lower.
- If any audit under this Section reveals any material breach of these Terms of Use or the Data Usage Agreement by Customer, the Customer shall reimburse Company for the reasonable costs of the audit.

13. Miscellaneous
- Force Majeure. Except for the Customer's payment obligations under the Data Usage Agreement, neither Party will be responsible for any failure or delay in its performance under these Terms of Use due to causes beyond its reasonable control, including, but not limited to, labour disputes, strikes, lock-outs, internet or telecommunications failures, shortages of or inability to obtain labour, energy, or supplies, war, terrorism, riot, acts of God or governmental action, acts by hackers or other malicious third parties and problems



with the internet generally, and such performance shall be excused to the extent that it is prevented or delayed by reason of any of the foregoing.

- Independent Contractors. The Parties shall be independent contractors under these Terms of Use, and nothing herein will constitute either Party as the employer, employee, agent or representative of the other Party, or both Parties as joint venturers for any purpose.

- Trademarks. The Customer authorizes the Company to use the trade name, trademark and logo of the Customer for the purpose of listing Customer in its general list of customers. Customer also permits Company to bring out press releases, create case studies on anonymized basis and will be open to provide quotes from time to time solely for Company's marketing purposes, provided Company obtains prior written approval of the Customer specific to such quotes, which approval shall not be unreasonably withheld or delayed. Company shall comply with Customer's guidelines regarding use of Customer's trademarks.

- Assignment. Customer shall not have the right to assign, transfer, resell or sublicense Customer's rights or obligations hereunder. Any attempt to assign, transfer, resell or sub-license such rights or obligations without Company's prior written approval will be null and void. Except to the extent forbidden in this Section 13.4, this Agreement will be binding upon and inure to the benefit of the Parties' respective successors and assigns.

- Severability. If one or more of the provisions contained in these Terms of Use is found by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions will not be affected. The provisions will be revised only to the extent necessary to make them enforceable.

- No Waiver. No action of a Party, other than an express written waiver, may be construed as a waiver of any provision of these Terms of Use. A delay on the part of a Party in the exercise of its rights or remedies will not operate as a waiver of those rights or remedies, and a single or partial exercise by a Party of any of the rights or remedies will not preclude other or further exercise of that right or remedy. A waiver of a right or remedy on any one occasion will not be construed as a bar to or waiver of rights or remedies on any other occasion.

- Governing Law and Jurisdiction. These Terms of Use will be governed by the laws of Singapore. The Company and the Customer agree that any claims, legal proceedings, or litigation arising in connection with these Terms of Use, will be brought solely in the courts of Singapore. If any provision herein is held to be unenforceable, the remaining provisions will remain in full force and effect. All rights and remedies hereunder are cumulative.

- Notices. Any notice required to be delivered hereunder will be deemed delivered: (a) upon delivery, if delivered by courier or by hand (against receipt); or (b) three (3) days after posting, if sent by electronic mail, fax, or certified or registered mail, return receipt requested. All notices to the Company and the Customer will be sent to the addresses set forth in the Data Usage Agreement or to such other address as a Party may designate by written notice to the other.