**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NEAR INTELLIGENCE, INC., et al.,[1] | Case No. 23-11962 (TMH) |
| Debtors. | |
| DRIVETRAIN, LLC, as Plan Administrator and Trustee of Near Intelligence, Inc. et al., Litigation Trust, | Adv. Pro. No. 25-52298 (TMH) |
| Plaintiff, | |
| v. | |
| MOBILEFUSE, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION**

## I.    Introduction

Between May 2021 and September 2023, companies in the Near Intelligence group wired more than $25 million to MobileFuse, LLC in sixteen transfers that the Trustee calls the Sham Payments. On the allegations of the First Amended Complaint (the "FAC"), the money bought nothing. The invoices behind the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857); Near Intelligence LLC (9004); Near North America, Inc. (9078); and Near Intelligence Pte. Ltd. The Debtors' headquarters is located at 100 W Walnut St., Suite A 4, Pasadena, California 91124.

payments were calculated not by anyone at MobileFuse but by Near's own chief financial officer, and several were issued in the name of an entity that appears never to have existed. Some payments traveled through a currency exchange that exchanged no currency. MobileFuse timed the sums it legitimately owed Near so that its money went out only after Near's money came in. When questions loomed, the parties papered the relationship with a data license agreement drafted in 2022, backdated to 2020, and signed in 2022. Throughout most of this period, Near's three most senior officers secretly held a ten percent stake in MobileFuse through layered offshore entities, acquired on terms that one of MobileFuse's founders privately called a bargain. In the scheme's final weeks, Near's insiders also agreed, without explanation, to let MobileFuse extinguish a $3 million debt for half that amount. The unraveling was swift. Near withdrew three years of financial statements, placed the officers on leave, and filed these chapter 11 cases.

The Trustee of the litigation trust created under Near's confirmed plan now sues to claw back the money. The First Amended Complaint pleads thirteen counts: claims to avoid and recover the Sham Payments and the debt settlement as intentionally and constructively fraudulent transfers, claims for breach of two agreements that MobileFuse simply stopped paying, a claim for unjust enrichment, and claims to subordinate and disallow MobileFuse's claim against the estates. MobileFuse moves to dismiss every count. It argues that the doctrine of in pari delicto and the <u>Wagoner</u> rule bar the Trustee at the threshold because Near's own officers ran the scheme, that the fraudulent transfer counts lack the plausibility

and particularity the rules demand, that the earliest transfers are time-barred, and that the remaining counts fail as a matter of law.

The posture matters. Nothing in this opinion decides whether any of this happened. On a motion to dismiss, the Court accepts the well-pleaded allegations as true and asks only whether each count, so taken, states a claim on which the Trustee may proceed to discovery.

The Court takes the threshold defenses first, then the avoidance counts, and finally the contract, unjust enrichment, and claims-related counts. Neither in pari delicto nor *Wagoner* bars any claim. The avoidance powers belong to the Trustee in its own right, and whether the officers' fraud may be imputed to Near cannot be resolved on the face of this complaint. The intentional fraud counts are pleaded with the particularity that Rule 9(b) requires, the contract and unjust enrichment counts state claims under any potentially applicable law, the subordination and claim objection counts may proceed, and no count is untimely. The constructive fraud counts largely survive as well, with one exception. Constructive fraud is measured transferor by transferor, and as to one transferor, non-debtor Near Holdco, the FAC pleads the financial condition of the Near enterprise as a whole and nothing about Near Holdco itself.

The Court therefore grants the motion as to Counts I and II to the extent they seek to avoid transfers made by Near Holdco on a constructive fraud theory, each without prejudice, and denies the motion in all other respects.

## II.    Background[2]

On December 8, 2023, Near Intelligence, Inc. ("Near Inc."), Near Intelligence LLC ("Near LLC"), Near Intelligence Pte. Ltd. ("Near Singapore"), and Near North America, Inc. ("Near NA") (collectively, "Near") filed petitions under chapter 11.[3] This Court confirmed Near's plan that provided for the establishment of the Near Intelligence Inc. et al., Litigation Trust that has the authority to bring the claims here.[4] Drivetrain, LLC (the "Trustee") is the plan administrator and trustee of the litigation trust.

Prior to filing for bankruptcy, Near's corporate structure underwent significant changes that are relevant to the claims in the FAC. First, the operations of Near Pte. Ltd. ("Near Pte."), a non-debtor, were moved from Singapore to California, and its assets were transferred to Near Intelligence Holdings Inc. ("Near Holdco"), also a non-debtor, as part of an effort to be a more attractive target for a special purpose acquisition company ("SPAC") transaction.[5] Then, in early 2023, Near Holdco's interests and assets were acquired by Near Inc. and vested in Near LLC through a de-SPAC transaction.[6]

---

[2] The factual background is drawn from the allegations in the FAC, which are accepted as true for purposes of this Motion to Dismiss. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009).

[3] First Am. Compl. ¶¶ 10–14 ("FAC") [Adv. D.I. 24].

[4] Id. ¶ 10.

[5] Id. ¶¶ 23–24.

[6] Id.

In late 2019, Near and MobileFuse, LLC ("MobileFuse") entered into discussions that culminated in three separate agreements: (i) an agreement for Near to provide usage to MobileFuse in exchange for monthly minimum fees (the "2020 Usage Agreement"); (ii) an agreement for MobileFuse to provide services to Near (the "2020 Services Agreement");[7] and (iii) an agreement for the Near Insiders (as hereinafter defined) to invest $2 million in MobileFuse in exchange for a ten percent indirect stake in MobileFuse.[8]

Uniqequity Pte. Ltd. held the indirect stake. It was wholly owned by Uniqequity Limited, an entity created by three different companies. The sole shareholder of each was one of Anil Mathews, a co-founder and the Chief Executive Officer of Near; Shobhit Shukla, a co-founder and the president of Near; or Rahul Agarwal, the Chief Financial Officer of Near (collectively, the "Near Insiders").[9] Val Katayev, a co-founder, former Chief Executive Officer, and managing member of MobileFuse, considered the deal a "bargain" for Mathews, but "more strategic than money."[10]

The "go-live date" of the 2020 Usage Agreement and 2020 Services Agreement was delayed to April 1, 2021, at which point both parties were bound by the terms of the agreements.[11] The 2020 Usage Agreement provided that the

---

[7] The 2020 Services Agreement contains a New York choice of law provision (§ 10.3).
[8] Id. ¶¶ 25–27.
[9] Id. ¶¶ 4, 28.
[10] Id. ¶¶ 4, 34.
[11] Id. ¶ 29.

monthly minimum fees from MobileFuse to Near were "[u]p to USD 15 Million per annum by the end of June 2021," and "[a]t least USD 25 Million per annum thereafter."[12] In accordance with this agreement, Near invoiced MobileFuse $1.25 million for April 2021.[13] For the same month, MobileFuse's invoice to Near was $1.19 million, which was calculated not based on services provided by MobileFuse under the 2020 Services Agreement, but on the amount that Near invoiced MobileFuse.[14] The invoice from MobileFuse was calculated by Agarwal, one of the Near Insiders, not by anyone at MobileFuse.[15] The payments were timed so that MobileFuse would send its payment only after receiving the payment from Near.[16]

This invoice and payment pattern continued for each payment made by Near to MobileFuse (the "Sham Payments").[17] From May 2021 to September 2023, Near sent MobileFuse over $25 million in Sham Payments, as detailed in the table below.[18]

---

[12] Id.; Exhibit A – 2020 Usage Agreement 8 [Adv. D.I. 25.1].
[13] FAC ¶ 39.
[14] Id. ¶¶ 38–39.
[15] Id. ¶ 40.
[16] Id. ¶ 41.
[17] Id. ¶¶ 38, 44, 46.
[18] Id. ¶ 42.

| Payor Entity | Date | Amount |
|---|---|---|
| Near Pte. | May 27, 2021 | $1,185,569.00 |
| Near Pte. | June 30, 2021 | $1,155,880.00 |
| Near Pte. | July 26, 2021 | $1,167,917.00 |
| Near Pte. | October 20, 2021 | $2,765,694.00 |
| Near Pte. | January 26, 2022 | $1,408,046.00 |
| Near Holdco | September 29, 2022 | $1,595,040.00 |
| Near Holdco | September 29, 2022 | $1,250,096.00 |
| Near Singapore | February 6, 2023 | $4,295,024.00 |
| Near Singapore | February 28, 2023 | $1,404,533.00 |
| Near Singapore | May 11, 2023[19] | $1,369,349.00 |
| Near Singapore | June 15, 2023 | $1,390,481.00 |
| Near Singapore | June 28, 2023 | $2,500,000.00 |
| Near Singapore | June 28, 2023 | $236,195.00 |
| Near Singapore | September 13, 2023 | $2,500,000.00 |
| Near Singapore | September 13, 2023 | $250,574.00 |
| Near Singapore | September 28, 2023 | $1,195,508.00 |
| Total | | $25,669,906.00 |

Ken Harlan, a co-founder and the Chief Executive Officer of MobileFuse, and Matt Sessanta, the Director of Finance of MobileFuse, knew that Near's payments were unrelated to any services provided by MobileFuse.[20] At no time did MobileFuse transfer reasonably equivalent value, recognize a debt owing to Near, or offer repayment for a Sham Payment.[21]

---

[19] The FAC lists this date as May 11, 2021, but includes the amount in the calculation of Sham Payments made by Near Singapore between February 6, 2023 and September 28, 2023 in the counts seeking to avoid the Sham Payments. See FAC ¶¶ 42, 78, 83, 91, 96. This appears to be a scrivener's error that the parties did not address. For the purpose of this motion, the court will treat the payment as being made in 2023.

[20] Id. ¶¶ 4, 29, 36.

[21] Id. ¶ 46.

Near and MobileFuse made efforts to conceal the Sham Payments. The payment made on February 6, 2023, for example, was sent from Near to a currency exchange that transferred the money to MobileFuse without any currency being exchanged.[22] Harlan and Sessanta also assisted the Near Insiders in concealing the payments by limiting their communications about them to the Near Insiders.[23] Additionally, Near and MobileFuse created documents with false information to support the payments. The invoices that directed payment to MobileFuse supposedly originated from an entity named MFX Exchange LLC that appears never to have existed.[24] In February 2022, Agarwal directed the Near legal team to prepare an undated draft of a purported data license agreement between Near and MobileFuse.[25] Agarwal then added the date June 30, 2020, to the document before it was eventually signed by Mathews and Harlan on March 30, 2022.[26] Emails exchanged between Harlan and Agarwal indicate that both understood that the purpose of this agreement was to help justify the Sham Payments, even though the agreement did not require any payments except as stated in specific orders that never were issued.[27]

In the course of their relationship, Near and MobileFuse entered into two agreements other than the 2020 Usage Agreement under which Near provided

---

[22] Id. ¶ 53.
[23] Id. ¶ 37.
[24] Id. ¶ 54.
[25] Id. ¶ 55.
[26] Id.
[27] Id.

services to MobileFuse in exchange for MobileFuse paying a fixed fee: the Near Platform Usage Agreement dated January 1, 2022 (the "2022 Usage Agreement") and the Near Platform Usage Agreement dated January 1, 2023 (the "2023 Usage Agreement").[28] Each Usage Agreement superseded its predecessor.[29]

In July 2023, after Near became publicly traded, the Near Insiders sold back their MobileFuse stake.[30] Shortly thereafter, on August 15, 2023, Harlan emailed Mathews and Agarwal to give notice that MobileFuse was terminating the 2023 Usage Agreement.[31] Under the terms of the 2023 Usage Agreement, MobileFuse was required to give six months' notice before it could terminate and, during those six months, to continue paying its pro rata share of the $18 million annual fee. Additionally, MobileFuse was required to pay $250,000 for each month remaining from the date of termination until January 1, 2025.[32] MobileFuse had not made any payments toward the 2023 Usage Agreement, so, by the terms of the agreement, MobileFuse owed Near $18 million in annual fees for 2023, $3 million in pro rata annual fees for 2024 with a cancellation date in February 2024, and $2.5 million in early termination fees.[33] In the email, Harlan stated, "MobileFuse will clearly honor and pay the early termination fee as outlined in the agreement."[34]

---

[28] Id. ¶¶ 47–48.
[29] Id. ¶ 47.
[30] Id. ¶ 59.
[31] Id.
[32] Id.; Exhibit C – 2023 Usage Agreement 5 [Adv. D.I. 25.3].
[33] FAC ¶¶ 61–62.
[34] Id. ¶¶ 61, 63.

MobileFuse had also not paid any fees to Near from September 2022 to December 2022 and owed $6 million under the 2022 Usage Agreement.[35] In September 2023, Near sent two Sham Payments totaling $2,750,574.00 through a currency exchange, after which MobileFuse sent $3 million to pay fees owed for September and October 2022.[36] The Near Insiders then agreed, without explanation, that MobileFuse could extinguish its remaining $3 million debt under the 2022 Usage Agreement by making a $1.5 million payment (the "2023 Dues Settlement Agreement").[37] Near then paid the final Sham Payment of $1,195,508.00 through a currency exchange, and MobileFuse sent the $1.5 million payment.[38] The agreement did not purport to settle the amounts MobileFuse owed under the 2023 Usage Agreement, and MobileFuse made no payments toward those amounts.[39]

In October 2023, an internal investigation led to the Near Insiders being placed on leave by the Near board of directors; Near Inc. then announced that Near's "previously issued financial statements . . . should not be relied upon, including Near's financial statements as of and for each of the years ended December 31, 2022, 2021, and 2020 as well as [Near's] quarterly financial statements for the periods ended March 31, 2023 and June 30, 2023."[40]

---

[35] Id. ¶ 63.
[36] Id. ¶ 64.
[37] Id. ¶ 65.
[38] Id. ¶ 66.
[39] Id. ¶ 67.
[40] Id. ¶ 68.

10

Near subsequently filed for bankruptcy, and Near NA listed MobileFuse's

claim as a nonpriority claim for $724,730.42 in its schedule.[41] The Trustee then

brought this adversary complaint. The FAC asserts thirteen counts against

MobileFuse:

- Count I is for the avoidance of constructively fraudulent transfers under section 548(a)(1)(B)[42] for the Sham Payments made in or after January 2022;[43]

- Count II is for the avoidance of constructively fraudulent transfers under section 544(b)(1) for all of the Sham Payment amounts;[44]

- Count III is for the avoidance of intentionally fraudulent transfers under section 548(a)(1)(A) for the Sham Payments made in or after January 2022;[45]

- Count IV is for the avoidance of intentionally fraudulent transfers under section 544(b)(1) for all of the Sham Payment amounts;[46]

- Count V is for the recovery of the fraudulent transfers alleged in Counts I-IV under section 550(a);[47]

- Count VI is for the avoidance of the 2023 Dues Settlement Agreement as an intentionally fraudulent transfer under sections 548(a)(1)(A) and 550(a);[48]

- Count VII is for avoidance of the 2023 Dues Settlement Agreement as a constructively fraudulent transfer under sections 548(a)(1)(B) and 550(a);[49]

---

[41] Id. ¶ 69.
[42] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.
[43] FAC ¶¶ 77–81.
[44] Id. ¶¶ 82–88.
[45] Id. ¶¶ 89–93.
[46] Id. ¶¶ 94–98.
[47] Id. ¶¶ 99–101.
[48] Id. ¶¶ 102–06.
[49] Id. ¶¶ 107–11.

- Count VIII is for the avoidance of the 2023 Dues Settlement Agreement as either a constructively or intentionally fraudulent transfer under sections 544(b)(1) and 550(a);[50]

- Count IX is for breach of the 2022 Usage Agreement;[51]

- Count X is for breach of the 2023 Usage Agreement;[52]

- Count XI is for unjust enrichment;[53]

- Count XII is for the equitable subordination of MobileFuse's claim under section 510(c);[54] and

- Count XIII is an objection to MobileFuse's claim.[55]

MobileFuse has filed a motion to dismiss the Trustee's claims[56] arguing that the Trustee's claims are barred by the in pari delicto doctrine and the Wagoner[57] rule, that the Trustee has not adequately pleaded claims for constructively or intentionally fraudulent transfers, that certain of the fraudulent transfer claims are time-barred, and that the Trustee has not adequately pleaded a claim for equitable subordination.[58] The Trustee argues in response that the Wagoner rule is inapplicable in the Third Circuit, that the in pari delicto doctrine does not bar any claims, that the FAC adequately states a claim for relief for all counts, and that the transfers are not time-barred for the claims under which they are brought.[59] The

---

[50] Id. ¶¶ 112–18.
[51] Id. ¶¶ 119–24.
[52] Id. ¶¶ 125–30.
[53] Id. ¶¶ 131–36.
[54] Id. ¶¶ 137–42.
[55] Id. ¶¶ 143–45.
[56] Mot. to Dismiss Adversary Proceeding [Adv. D.I. 28].
[57] Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991).
[58] See Mem. of Law in Supp. of Mot. to Dismiss [Adv. D.I. 29].
[59] See Pl.'s Opp'n to Def.'s Mot. to Dismiss [Adv. D.I. 36].

parties additionally dispute which law applies to Counts IX through XI (the "Common Law Claims") and how the choice of law affects the in pari delicto analysis. The matter has been fully briefed. The Court heard oral argument on May 27, 2026.

### III.    Jurisdiction and Venue

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### IV.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable to adversary proceedings through Bankruptcy Rule 7012, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[60] In the Third Circuit, courts perform a two-part analysis. First, the court separates the factual and legal elements of the claim,  "accept[ing] all of the complaint's well-pleaded facts as true, but . . . disregard[ing] any legal conclusions."[61] Next, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"[62] Dismissal is also appropriate where an affirmative defense appears on the face of the complaint.[63]

---

[60] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
[61] Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009).
[62] Id. at 211 (quoting Iqbal, 556 U.S. at 679).
[63] Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001).

###### V.    Analysis

#### A. Choice of Law

When there is no overriding federal interest, "it is well settled in this Circuit that a bankruptcy court faced with the issue of which substantive state law to apply to a claim for relief in an adversary proceeding applies the choice of law rules of the forum state."[64] Courts in Delaware perform a separate choice of law analysis for each issue.[65] The issue analysis here can be split between Counts I through VIII and XII through XIII (the "Statutory Claims") and the Common Law Claims.

#### 1.  The Statutory Claims

The first question in a choice of law conflict is whether there is "a true conflict between the potentially applicable bodies of law."[66] Where no such conflict exists, there is no further need to analyze the applicable law.[67] The analysis of whether to dismiss the Statutory Claims would be the same regardless of the governing state law. These claims are based on federal statutes and, to the degree state law is applicable to them, the parties have not briefed any competing statutes or other law.[68] Given this lack of conflict, the choice of law analysis for these claims

---

[64] Mull Drilling Co., Inc. v. SemCrude, L.P. (In re SemCrude, L.P.), 407 B.R. 82, 104 (Bankr. D. Del. 2009).

[65] Whitwell v. Archmere Acad., Inc., 463 F. Supp. 2d 482, 485 (D. Del. 2006).

[66] Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006) (citing On Air Entm't Corp. v. Nat'l Indem. Co., 210 F.3d 146, 149 (3d Cir.2000)).

[67] Id.

[68] Because in pari delicto and Wagoner are not applicable to these claims in any applicable jurisdiction, see infra V.B.1, V.B.3, any differences in the application of these doctrines do not change this analysis.

concludes here, and the Court will address both Delaware and New York law, as those are the laws briefed for these claims.

### 2. The Common Law Claims

The parties have briefed a true conflict between the potentially applicable bodies of law for the Common Law Claims. MobileFuse argues that New York law applies and that under New York law, the adverse interest exception to the in pari delicto doctrine is unavailable to the Trustee, while the Trustee claims that either New Jersey or California law applies and that the adverse interest exception is available under these laws.[69] The three Common Law Claims are for breach of the 2022 Usage Agreement, breach of the 2023 Usage Agreement, and a claim for unjust enrichment that includes actions stemming from the Usage Agreements as well as actions unrelated to any agreement or contract.[70]

When parties have not effectively agreed on a choice of law to govern their contracts or when a claim is based on unjust enrichment without a valid governing choice of law clause, Delaware courts apply the "most significant relationship test" to determine what law governs.[71, 72] "This test requires that the court evaluate five

---

[69] See Mem. in Supp. 12–15; Opp'n to Mot. to Dismiss 7–11, 15–17; Reply Mem. of Law in Supp. of Mot. to Dismiss Pl.'s Am. Compl. 6–10 [Adv. D.I. 37].
[70] See FAC ¶¶ 119–36.
[71] RSUI Indem. Co. v. Murdock, 248 A.3d 887, 896 (Del. 2021) (quoting Liggett Grp. Inc. v. Affiliated FM Ins. Co., 788 A.2d 134, 137 (Del. Super. Ct. 2001)); Landis v. Sci. Mgmt. Corp., No. CIV. A. 7483, 1991 WL 19848, at *3 (Del. Ch. Feb. 15, 1991).
[72] The Usage Agreements contain a Singapore choice of law clause, but neither party argues that Singapore law applies, and the Trustee argues that it does not because Singapore has no substantial relationship to the parties. See Opp'n to Mot.

fact-intensive factors 'in deciding which state has the most significant relationship.'"[73] Such a test is inappropriate to undertake here, on a motion to dismiss, where the factual record is underdeveloped.[74] Because the parties addressed New York, California, and New Jersey law, the Court will presume, without deciding, that one of these states' laws applies.[75] The FAC survives if it states a plausible claim for relief under any of these state laws.[76]

## B. Neither the In Pari Delicto Doctrine nor Wagoner Bars the Trustee's Claims.

### 1. The in pari delicto doctrine does not apply to the Statutory Claims.

"The doctrine of in pari delicto provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim."[77] When a cause of action is brought by a trustee as a successor-in-interest under section 541, this

---

to Dismiss 8–9; Tr. of Hearing 17:14–19. Given the parties' positions, the court assumes, without deciding, that Singapore law does not apply.

[73] B.E. Cap. Mgmt. Fund LP v. Fund.com Inc., 171 A.3d 140, 148 (Del. Ch. 2017) (quoting Certain Underwriters at Lloyds, London v. Chemtura Corp., 160 A.3d 457, 465 (Del. 2017)).

[74] See Graboff v. The Collern Firm, No. CIV.A. 10-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010) ("Due to the complexity of this analysis, when confronted with a choice of law issue at the motion to dismiss stage, courts within the Third Circuit have concluded that it is more appropriate to address the issue at a later stage in the proceedings.").

[75] See Zazzali v. Hirschler Fleischer, P.C., 482 B.R. 495, 517 (D. Del. 2012) (in the absence of a choice of law determination, presuming that either of the state laws "specifically addressed by the parties in their briefing" applied).

[76] See Graboff, 2010 WL 4456923, at *8 ("[T]he Complaint will survive . . . if Plaintiff states a claim sufficient under either Pennsylvania or Illinois law.").

[77] Off. Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 354 (3d Cir. 2001).

16

bar extends to the trustee.[78] Section 541 defines the bankruptcy estate as including

"'all legal or equitable interests of the debtor in property as of the commencement' of

bankruptcy" which, by its plain language, excludes the consideration of post-

petition events.[79] For claims that are property of the estate under section 541, the

relevant question is whether the debtor could have brought the claims at the time it

filed its petition.

"However, when a trustee brings an action based on a section of the

Bankruptcy Code that does not contain limiting language such as that in § 541, a

court may consider post-petition events."[80] The Third Circuit specifically has held

that an innocent trustee's avoidance claims are not subject to the in pari delicto

doctrine.[81] Here, Counts I through VIII are all brought under such avoidance

powers. The other Statutory Claims likewise arise under specific statutes in the

Bankruptcy Code – sections 502 and 510 – and do not rely on section 541 or contain

similar limiting language. In pari delicto, therefore, does not bar any of the

Statutory Claims.[82]

---

[78] Id. at 357.

[79] Id. at 356–57 (quoting 11 U.S.C. § 541(a)).

[80] Stanziale v. Pepper Hamilton LLP (In re Student Fin. Corp.), 335 B.R. 539, 555
(D. Del. 2005) (citing McNamara v. PFS (In re Pers. & Bus. Ins. Agency), 334 F.3d
239, 241 (3d Cir. 2003)).

[81] McNamara, 334 F.3d at 245–47.

[82] See Stanziale, 335 B.R. at 554 (declining to extend Lafferty to an equitable
subordination claim brought under section 510); Picard v. Avellino (In re Bernard L.
Madoff Inv. Sec. LLC), 557 B.R. 89, 127 (Bankr. S.D.N.Y. 2016) (finding that in pari
delicto did not apply to an equitable subordination claim brought under
section 510).

### 2. The in pari delicto doctrine does not bar the Common Law Claims.

For the in pari delicto defense to apply, the wrongdoing must be imputed from the corporation's agents to the corporation itself.[83] Under the adverse interest exception, "fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and 'not for the benefit of the corporation.'"[84] MobileFuse argues that the adverse interest exception is unavailable here because the FAC does not plead it expressly,[85] and, in any event, the FAC shows that Near benefited from the scheme under New York's narrow standard[86] MobileFuse relies on New York law holding that the exception applies only when the agents "completely abandon" the corporation's interest such that the corporation receives no benefit at all.[87]

MobileFuse first contends that the adverse interest exception is unavailable because the FAC does not address it on its face. Plaintiffs, however, need not anticipate affirmative defenses and plead around them. The defendant bears the

---

[83] Lafferty, 267 F.3d at 355.

[84] Id. at 359 (quoting Waslow v. Grant Thornton L.L.P. (In re Jack Greenberg, Inc.), 212 B.R. 76, 84 (Bankr. E.D. Pa. 1997)).

[85] Tr. of Hearing 20:3–8.

[86] Reply 10 [Adv. D.I. 37].

[87] Id. (citing Kirschner v. KPMG LLP, 938 N.E.2d 941 (N.Y. 2010); then citing Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Delaware, Inc.), 541 B.R. 219, 235 (Bankr. D. Del. 2015); and then citing Giuliano v. Ferdinand (In re Liquid Holdings Grp., Inc.), No. 16-10202 (KG), 2018 WL 2759301, at *16 (Bankr. D. Del. June 6, 2018)).

burden of showing the defense applies on the face of the complaint.[88] On this record, MobileFuse has not met that burden.

MobileFuse also argues that, on the face of the FAC, Near benefited here because it allegedly received more money from MobileFuse than it paid in Sham Payments and because the payment scheme supposedly inflated Near's revenue, making it a more attractive SPAC target.[89] Neither contention is supported by the FAC. The FAC alleges that MobileFuse's payments to Near were made on account of legitimately owed fees under the Usage Agreements and were not repayments of the Sham Payments.[90]

Nor is it apparent on the face of the FAC that the Sham Payments contributed to Near's attractiveness to investors or materially assisted the SPAC transaction. MobileFuse cites to paragraphs 24 through 27 of the FAC, which describe Near's reorganization and de-SPAC transaction and refer to a "strategic partnership" with MobileFuse, but those paragraphs do not allege that the Sham Payments were part of that arrangement or that they inflated reported revenue.[91] On these allegations, the Court cannot conclude, as a matter of law at the pleading stage, that Near necessarily obtained a corporate benefit from the scheme sufficient to defeat the adverse-interest exception under New York's narrow standard.

---

[88] See Gomez v. Toledo, 446 U.S. 635, 640 (1980).
[89] Mem. in Supp. 2, 7; Reply 2.
[90] FAC ¶¶ 38, 44–51.
[91] Mem. in Supp. 7; FAC ¶ 24–27.

MobileFuse also cites an indictment, but the Court cannot rely on the truth of facts asserted in another proceeding for purposes of resolving a motion to dismiss.[92]

MobileFuse also relies on Augustus as a "clear and straightforward" case of in pari delicto.[93]  In that case, the court held that a breach of contract claim was barred by the related principle that "agreements made for the purpose of perpetrating a fraud are unenforceable"[94] where the only reasonable reading of the complaint was that the contract existed solely to mislead investors about the defendant's commitment to fund the venture. On those allegations, the contract was "entered into for the purpose of perpetrating a fraud and [was] therefore an illegal contract."[95]  The facts in the FAC do not lead as directly to a similar conclusion. The FAC alleges that the Usage Agreements were performed in the ordinary course until MobileFuse stopped paying in 2022 and that Near provided services for which MobileFuse paid. Although the FAC supports an inference that the separate 2020 Services Agreement and the later backdated data-license agreement were used to lend a veneer of legitimacy to the Sham Payments, it does not allege that the Usage Agreements themselves were created for the purpose of perpetrating a fraud.

---

[92] See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd., 181 F.3d 410, 413 (3d Cir. 1999) ("[O]n a motion to dismiss, we may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.").

[93] Tr. of Hearing 13:6–22; see also Mem. in Supp. 16–17.

[94] Ryniker v. Washington (In re Augustus Intel., Inc.), No. 21-10744 (JTD), 2025 WL 936432, at *5 (Bankr. D. Del. Mar. 26, 2025).

[95] Id. at *7.

Augustus, therefore, does not make the in pari delicto defense apparent on the face of the FAC as to Counts IX and X.

Because MobileFuse's in pari delicto arguments fail under even New York law, which it contends applies and which imposes the narrowest interpretation of the adverse interest exception, the Court need not consider whether they would succeed under New Jersey or California law.

### 3. Wagoner is inapplicable.

The Wagoner rule "is related to but distinct from in pari delicto," and addresses the prudential standing of third parties to assert claims on behalf of entities that participated in the alleged misconduct.[96] The existence and scope of prudential standing is a federal question.[97] When faced with a federal question, this court is bound by Third Circuit precedent regardless of what state law applies or what contractual choice-of-law clause may exist.[98]

---

[96] Ehrlich v. Com. Factors of Atlanta, 567 B.R. 684, 697–98 (N.D.N.Y. 2017).

[97] See Wagoner, 944 F.2d at 118–20 (grounding the rule in the "case or controversy requirement of the Constitution").

[98] See Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (quoting Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.), 950 F.2d 839, 847 (2d Cir. 1991)) ("[F]ederal courts comprise a single system applying a single body of law, and no litigant has a right to have the interpretation of one federal court rather than that of another determine his case.").

In Lafferty, the Third Circuit favorably cited Wagoner when analyzing the in pari delicto doctrine, but expressly declined to adopt Wagoner's standing analysis.[99] Accordingly, the Wagoner rule does not apply to any of these claims.[100]

### 4. The Breach of Contract Claims Survive (Counts IX and X).

MobileFuse does not argue any alternative basis against Counts IX and X, which are for breach of the 2022 and 2023 Usage Agreements, respectively. Because neither the in pari delicto doctrine nor the Wagoner rule bars these claims, the motion to dismiss is denied as to these claims.

### C. The FAC Adequately Alleges Plausible Claims to Avoid and Recover Constructive and Actual Fraudulent Transfers, Except as to Constructive Fraudulent Transfers by Near Holdco (Counts I-VIII).

### 1. Counts II and IV adequately allege applicable state law.

MobileFuse argues that the Trustee has failed to allege facts sufficient for a claim under section 544 because the Trustee failed to identify the applicable state law. However, this is not grounds to dismiss these claims so long as the Trustee has adequately alleged facts to sustain the claim under applicable state law.[101]

---

[99] Lafferty, 267 F.3d at 346 ("An analysis of standing does not include an analysis of equitable defenses, such as in pari delicto.").

[100] Even if the Wagoner rule were applicable here, it would not apply to the Statutory Claims. See Picard, 557 B.R. at 123 (finding that the Wagoner rule does not apply to claims specifically conferred on a trustee by the Bankruptcy Code); Kwok v. Despins (In re Kwok), 172 F.4th 145, 154–55 (2d Cir. 2026) (distinguishing between personal claims, to which the Wagoner rule applies, and general claims, to which it does not).

[101] Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC), 470 B.R. 289, 299–300 (D. Del. 2012) (denying a motion to dismiss "[a]lthough no applicable law is specifically alleged in the Complaint"); UD Dissolution Liquidating Tr. v. Sphere 3D Corp. (In re UD Dissolution Corp.), 629 B.R. 11, 40 (Bankr. D. Del. 2021)

The relevant New York and Delaware statutes are substantially similar to the Bankruptcy Code, such that whether they state adequate claims for relief will be discussed together except where they diverge.[102]

### 2. The Trustee has standing to avoid the alleged fraudulent transfers.

MobileFuse argues that the Trustee lacks standing to avoid transfers made by Near Pte. and Near Holdco because those entities are alleged transferors but are not debtors in these cases.[103] A trustee may avoid only the fraudulent transfer of an "interest of the debtor in property."[104] When a non-debtor transfers its own property, courts have held that the estate's trustee lacks standing to avoid the transfer because the debtor never held an interest in the property transferred.[105] In Crystallex, the Third Circuit similarly held that under Delaware law, which is "nearly identical" to the Bankruptcy Code, a non-debtor subsidiary with its own identity could not be treated as the transferor in a fraudulent transfer claim brought on behalf of the debtor.[106] The court there did not address the different

---

(rejecting an argument that the court should dismiss a claim under section 544 where the complaint "fail[ed] to identify any applicable state law").

[102] Kramer v. Sooklall (In re Singh), 434 B.R. 298, 311 n.5 (Bankr. E.D.N.Y. 2010) (explaining that the only material difference between New York law and the Bankruptcy Code as to the recovery of fraudulent transfers is the lookback period); Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A., 879 F.3d 79, 86 (3d Cir. 2018) ("The relevant DUFTA and Bankruptcy Code provisions are nearly identical, and Delaware courts have interpreted and applied them uniformly.").

[103] Mem. in Supp. 21.

[104] 11 U.S.C. §§ 544(b)(1), 548(a).

[105] See Klauder v. Echo/RT Holdings, LLC, 152 A.3d 581, 2016 WL 7189917, at *2–3 (Del. Dec. 12, 2016).

[106] Crystallex Int'l Corp. v. Petroleos De Venezuela, S.A., 879 F.3d 79, 85–89 (3d Cir. 2018).

situation in which the transferor later becomes a predecessor-in-interest whose assets are acquired by the debtor.

An interest of the debtor in property encompasses 'that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.'"[107]

That definition provides a straightforward statutory link between a prepetition transferor and a debtor successor-in-interest: if, but for the transfer, the property would have vested in the debtor and become estate property, the transfer is of "an interest of the debtor in property" even though the transferor was formally a different entity. The FAC alleges that Near Pte.'s operations and assets were transferred to Near Holdco, and that Near Holdco's interests and assets were then acquired by Near Inc. and vested in Near LLC through the de-SPAC transaction. [108] Taken as true, those allegations support a plausible inference that Near LLC is a successor-in-interest to Near Pte. and Near Holdco and that the assets transferred to MobileFuse would have become property of Near LLC's estate absent the challenged transfers.

### 3. The FAC does not adequately allege constructive fraudulent transfers as to transfers made by Near Holdco but does so as to all other transfers.

Section 548 allows a trustee to avoid transfers that were made for less than reasonably equivalent value at a time the debtor was insolvent, left the debtor with

---

[107] Michaelson, 470 B.R. at 298 (quoting Begier v. I.R.S., 496 U.S. 53, 58 (1990)).
[108] See FAC ¶ 24.

unreasonably small capital for ongoing or imminent business or transactions, or when the debtor intended to or believed it would incur debts it would be unable to pay as they became due.[109]

### a. Reasonably Equivalent Value

In determining whether a debtor received reasonably equivalent value for a transfer, courts first ask whether the debtor received any value at all.[110] Once it is determined that the debtor received some value, courts determine "whether the debtor got roughly the value it gave."[111] Courts have held that the complaint only needs to identify the date, amounts, and transferee of each transfer and allege that each was made for less than reasonably equivalent value to adequately plead that the debtor did not receive reasonably equivalent value.[112]

Here, in exchange for the Sham Payments, Near may have received some value from the services provided by MobileFuse.[113] MobileFuse argues that Near also received value in the form of the payments made from MobileFuse to Near.[114]

---

[109] 11 U.S.C. § 548 (a)(1)(B).

[110] See Mellon Bank, N.A. v. Off. Comm. Unsecured Creditors R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 150 (3d Cir. 1996).

[111] Pension Transfer Corp. v. Beneficiaries Under the Third Amend. To Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.), 444 F.3d 203, 212–13 (3d Cir. 2006).

[112] Ctr. City Healthcare, 641 B.R. at 804.

[113] The FAC states that there is "no evidence" that MobileFuse ever provided services, but stops short of alleging that no services were, in fact, ever provided. FAC ¶ 31. Whether or not any services were actually provided, the Trustee plausibly alleges that the Sham Payments were in excess of and calculated without regard for the value of these services. FAC ¶¶ 29–31, 38–40.

[114] See Mem. in Supp. 18.

MobileFuse does not make an argument as to what, if any, value Near gained from the 2023 Dues Settlement Agreement in Count VII, and no such value is apparent on the face of the FAC.[115]

### b. Insolvency

A company is insolvent under the Bankruptcy Code when its debts exceed the fair valuation of its property.[116] To survive a motion to dismiss, the plaintiff must allege sufficient facts, beyond conclusory statements, to support an inference of insolvency, but need not prove them.[117] Such facts need not be comprised of detailed financial statements or analysis.[118]

The Trustee alleges that Near suffered losses every year and that its liabilities exceeded the fair value of its assets from April 2021 through the petition date, as did the liabilities of Near Pte., Near Holdco, Near Singapore, and Near Inc. The Trustee further alleges that Near never achieved positive earnings before interest, taxes, depreciation, and amortization at any time from April 2015 through the petition date. According to the Trustee, by April 2021, Near's debts exceeded its total enterprise value, including the fair value of its assets, by $69.1 million, and its debts continued to exceed its assets by roughly $70 million for the remainder of 2021. From July 2022 through the petition date, the Trustee alleges, Near's debts

---

[115] See FAC ¶ 65 ("No explanation was ever provided for this 50% discount.").
[116] See Gavin Solmonese, LLC v. Shyamsundar (In re Amcad Holdings, LLC), 579 B.R. 33, 38 (Bankr. D. Del. 2017) (quoting 11 U.S.C. § 101(32)(A)).
[117] See In re Troll Commc'ns, LLC, 385 B.R. 110, 124 (Bankr. D. Del. 2008).
[118] Dershaw v. Nevels (In re Swarthmore Grp., Inc.), 667 B.R. 258, 277 (Bankr. E.D. Pa. 2025); In re Amcad Holdings, 579 B.R. at 38–39.

exceeded its fair enterprise value by more than $100 million. The Trustee also alleges that Near's cash generation was never sufficient to fund its operations and pay its debts as they came due, and that Near Pte. was inadequately capitalized and unable to pay its debts as they became due as of at least April 1, 2021.[119]

The FAC also generally alleges that the transfers were made while their respective transferors were insolvent.[120] However, these allegations state legal conclusions that cannot be credited on a motion to dismiss.[121]

In assessing whether insolvency was adequately pleaded, it is useful to remember the groups of entities at issue here. The FAC defines Near as being comprised of Near Inc., Near LLC, Near NA, and Near Singapore. Of these, only Near Singapore is alleged to be a transferor for the Sham Payments, with Near LLC also being implicated as a successor-in-interest to the other Sham Payment transferors—Near Pte. and Near Holdco. In the FAC, the Trustee alleges that the 2023 Dues Settlement Agreement was a transfer of value from Near Inc. to MobileFuse.[122]

Near Holdco is not included under the defined term Near, and the FAC only alleges that its liabilities, along with those of the other transferors, exceeded Near's assets at all relevant times. While Near LLC, which is a part of Near, is a successor-in-interest, no conclusions can be drawn about Near Holdco based on the insolvency

---

[119] FAC ¶¶ 71–76.
[120] Id. ¶¶ 80, 85, 104, 109, 113.
[121]  See Ashcroft v. Iqbal, 556 U.S. 662, 680–81 (2009).
[122] FAC ¶¶ 103, 106, 115, 118.

of its successor. There are no allegations regarding Near Holdco's assets, ability to pay debts, or other allegations that could lead to a plausible inference of its insolvency.

Near Pte. is also not included under the defined term Near, but the FAC includes the specific allegations that it was inadequately capitalized and unable to pay its debts as they became due as of at least April 1, 2021, along with the allegation that its liabilities, along with those of the other transferors, exceeded Near's assets at all relevant times. These allegations are adequate to lead to a plausible inference that Near Pte. was insolvent on the dates it made the Sham Payments.

Near Singapore and Near Inc. are both Near entities. The only specific allegation about them is that their liabilities, along with those of the other transferors, exceeded Near's assets at all times. The Trustee points to PostRock[123] as support for its position that the Court can infer insolvency of the individual transferors based on the facts alleged about Near's financial condition.[124] In that case, the court found that, for a motion to dismiss, a complaint adequately alleged that a subsidiary debtor was insolvent when it stated that the subsidiary was primarily liable on a borrowing base whose value exceeded the combined assets of the combined debtors and far exceeded its own asset base by a year before the

---

[123] Moriarty v. Klvac (In re PostRock Energy Corp.), 595 B.R. 858 (Bankr. W.D. Okla. 2019).
[124] Tr. of Hearing 36:17–37:17.

petition date.[125] The debtors there maintained consolidated books; the debtors' ledgers had proven inaccurate and unreliable; and the trustee, who was the plaintiff, had no input in the preparation of the books, records, or ledgers.[126] Although the facts are not identical, the Trustee has alleged that these transferors' liabilities exceed the combined value of Near's assets at all relevant times. Moreover, the Trustee alleges that Near, as a whole, remained more than $100 million insolvent from July 2022 through the petition date, during which time period all the transfers by debtor entities occurred. Also, the FAC alleges that the Debtors actually withdrew three years of financial statements. The allegations, taken together, are sufficient on a motion to dismiss for an inference that Near Singapore and Near Inc. were insolvent.

Accordingly, Counts I and II, insofar as they rest on a constructive fraud theory for transfers made by Near Holdco, are dismissed without prejudice.

### 4. The FAC adequately alleges intentional fraud.

The FAC also asserts claims to avoid alleged intentional fraudulent transfers. Trustees may avoid transfers that the debtor made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."[127] Claims brought under section 548(a)(1)(A) "must meet the elevated pleading standards of

---

[125] PostRock, 595 B.R. at 867–68.
[126] Id. at 867.
[127] 11 U.S.C. § 548(a)(1)(A).

29

Federal Rule of Civil Procedure 9(b)," but these requirements "are to be interpreted liberally where the claim is asserted by a trustee or trust."[128]

Fraud need not be pleaded directly, but may be shown through circumstantial evidence, such as "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."[129] The badges of fraud include:

> (1) the relationship between the debtor and the transferee; (2) consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) how much of the debtor's estate was transferred; (5) reservation of benefits, control, or dominion by the debtor over the property transferred; and (6) secrecy or concealment of the transaction.[130]

In analyzing fraudulent intent based on the badges of fraud, courts look only to the badges that are present and do not give weight to those that are not.[131] "No one factor or particular combination of factors is necessary to support a finding of fraud; even a strong showing of a single factor may be enough," but a confluence of

---

[128] Cred. Inc. Liquidation Trust v. Uphold HQ Inc. (In re Cred Inc.), 650 B.R. 803, 834 (Bankr. D. Del. 2023) (quoting Charys Liquidating Tr. v. Growth Mgmt., LLC (In re Charys Holding Co.), No. 08-10289, 2010 WL 2774852, at *3 (Bankr. D. Del. July 14, 2010)), aff'd, 658 B.R. 783 (D. Del. 2024).

[129] In re Swarthmore Group, 667 B.R. at 276 (quoting Alameda Rsch. Ltd. v. Giles (In re FTX Trading Ltd.), Case No. 22-11068 (JTD), 2024 WL 4562675, at *7 (Bankr. D. Del. Oct. 23, 2024)).

[130] Id.

[131] Id.

several factors may provide stronger evidence of intent.[132] In addition to the badges of fraud, courts may consider other evidence of the debtor's intent.[133]

The Trustee argues that it has pleaded facts supporting four badges of fraud: (i) that Near did not receive adequate consideration for the transfer; (ii) that Near was insolvent when the transfers were made; (iii) that the Near Insiders, who controlled each transferor, secretly owned a stake in MobileFuse; and (iv) that the Near Insiders attempted to conceal the transfers.[134] It additionally argues that the Court can infer the Debtors' intent through the consequences of their actions.[135] MobileFuse argues that the claims are not stated with particularity and that the alleged scheme "make[s] no logical sense," making the claim implausible under the pleading standards.[136]

The first two badges of fraud, failure to receive reasonably equivalent value and insolvency, are discussed in relation to constructive fraudulent transfers.[137] Accordingly, the Trustee has plausibly alleged that the transferors failed to receive reasonably equivalent value and has plausibly alleged that all the transferors other than Near Holdco were insolvent.

---

[132] Id. (quoting Feldman v. Lynch (In re Fitzpatrick Container Co.), 663 B.R. 648, 657 (Bankr. E.D. Pa. 2024)).
[133] Carickhoff v. Wedbush Sec., Inc. (In re Live Well Fin., Inc.), 652 B.R. 699, 705 (Bankr. D. Del. 2023).
[134] Opp'n to Mot. to Dismiss 25.
[135] Id.
[136] Reply 15–16.
[137] See supra Section V.C.3.

As to the other badges, the Trustee has plausibly alleged that, for all but the last three Sham Payments, the Near Insiders owned a ten percent interest in MobileFuse, acquired at a discount, establishing a close relationship between the Near Insiders and MobileFuse. The Trustee has also plausibly alleged that the transferors made efforts to conceal the payments by presenting them as legitimate invoices, using a currency exchange to wire payments, and creating false, backdated agreements.[138] The badges of fraud that are adequately pleaded are sufficient to state a claim for actual fraudulent transfer.[139]

Additionally, the crux of the Trustee's allegations is that the transferors paid unowed sums to MobileFuse without receiving a benefit in kind, and a natural consequence of such a transfer would be to deprive Near creditors of these funds. This natural consequence supports a presumption that it was the intention of the transferors to do so.[140]

MobileFuse argues that the Trustee's allegations regarding fraudulent intent are undercut because the Near Insiders' gains from the alleged scheme were negligible when compared with Near's losses.[141] This is, however, only a competing

---

[138] FAC ¶¶ 52–55.

[139] See, e.g., Forman v. Kelly Cap., LLC (In re Nat'l Serv. Indus., Inc.), No. 14-50377, at *5 (MFW), 2015 WL 3827003 (Bankr. D. Del. June 19, 2015) (denying a motion to dismiss a fraudulent transfer claim where three badges of fraud were alleged).

[140] See In re Sentinel Mgmt. Grp., Inc., 728 F.3d 660, 667 (7th Cir. 2013) ("'[E]very person is presumed to intend the natural consequences of his acts.'" (quoting In re Danville Hotel Co., 38 F.2d 10, 21 (7th Cir. 1930))).

[141] Mem. in Supp. 23–24.

argument about the intent of the transferors. The Court cannot consider this alternative interpretation of the facts at this stage, and instead draws the reasonable inference in the Trustee's favor.[142]

### 5.  The avoidance counts are timely.

MobileFuse next argues that the Trustee's claims for fraudulent transfer are untimely as to transfers that occurred prior to December 8, 2021, because claims under section 548(a)(1) may only be made regarding transfers made no more than two years prior to the filing of the bankruptcy petition. Here, the bankruptcy petition was filed on December 8, 2023. However, the claims made under section 548 do not include any transfers made before December 8, 2021. Counts I, III, VI, and VII only include transfers made on or after  January 26, 2022. The Trustee is seeking to avoid transfers made before December 8, 2021 under section 544, which borrows the lookback period from applicable state law.[143] All of the alleged transfers fall within the four-year lookback period provided by both Delaware and New York law.[144]

---

[142] <u>Bagic v. Univ. of Pittsburgh</u>, 773 F. App'x 84, 88–89 (3d Cir. 2019).
[143] <u>UMB Bank, N.A. v. Sun Cap. Partners V, LP</u> (<u>In re LSC Wind Down, LLC</u>), 610 B.R. 779, 785 (Bankr. D. Del. 2020); <u>see also</u> <u>Sikirica v. Wettach</u> (<u>In re Wettach</u>), 489 B.R. 496, 509 (Bankr. W.D. Pa. 2013) (using the Pennsylvania lookback period for a claim under section 544), <u>aff'd</u>, 511 B.R. 760 (W.D. Pa. 2014), <u>aff'd</u>, 811 F.3d 99 (3d Cir. 2016).
[144] <u>See</u> 6 Del. C. § 1309; N.Y. Debt. & Cred. Law § 278.

**D. The FAC adequately alleges a claim for unjust enrichment.**

MobileFuse argues that the unjust enrichment claim should be dismissed because the parties' relationship is governed by written agreements.[145] Because this argument is discussed only in a footnote, the Court need not consider it.[146] However, this argument also fails on the merits. While quasi-contractual theories of liability, such as unjust enrichment, fail when they are based on the parties' contractual relationship, where the subject of the quasi-contractual relationship is different than that of the contractual relationship or the enforceability of the contract is at issue, the quasi-contractual claim survives.[147] Here, the Trustee has plausibly alleged that the Sham Payments were not related to any contractual relationship between the parties.[148] To the extent Count XI instead rests on conduct arising from the Usage Agreements, the Trustee may plead unjust enrichment in the alternative to its breach of contract claims, and the claim is not subject to dismissal at this stage merely because a written agreement may ultimately be found to govern the same conduct.[149]

---

[145] Mem. in Supp. 17 n.5.

[146] Higgins v. Bayada Home Health Care Inc., 62 F.4th 755, 763 (3d Cir. 2023) (quoting John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997)).

[147] Stanziale v. Emerson Radio Corp. (In re Home Easy, Ltd.), 672 B.R. 595, 647–48 (Bankr. D.N.J. 2025).

[148] FAC ¶¶ 29–31, 40.

[149] Fed. R. Civ. P. 8(d)(2), made applicable by Fed. R. Bankr. P. 7008.

### E. The FAC adequately alleges claims for equitable subordination (Count XII) and disallowance of claims (Count XIII).

To state a claim for equitable subordination under the Bankruptcy Code, the complaint must allege that the claimant engaged in inequitable conduct that resulted in injury to other creditors or conferred an unfair advantage on the claimant and that the equitable subordination of the claim is not inconsistent with the Bankruptcy Code.[150] "If the misbehaving creditor is a non-insider, the plaintiff must generally allege gross misconduct."[151] Gross misconduct is "generally that which rises to the level of fraud, overreaching, or spoilation, or involves moral turpitude."[152] The FAC alleges that MobileFuse engaged in fraudulent behavior, such as assisting with concealing the Sham Payments to funnel unearned payments from Near, which meets this standard.

The standard the Court applies turns on whether MobileFuse is an insider of Near. The Bankruptcy Code does not count a creditor in MobileFuse's position among the statutory insiders of a corporate debtor,[153] and the equity interest the FAC describes runs the wrong direction to make MobileFuse an affiliate.[154] It was the Near Insiders who held an indirect stake in MobileFuse, not Near that held a stake in MobileFuse or MobileFuse that held one in Near. The allegations

---

[150] Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982, 986–87 (3d Cir. 1998).

[151] Tilton v. MBIA Inc. (In re Zohar III, Corp.), 620 F. Supp. 3d 147, 152 (D. Del. 2022).

[152] Off. Comm. of Unsecured Creditors v. Vagenas (In re Pack Liquidating, LLC), No. 22-10797 (CTG), 2025 WL 2587577, at *13 (Bankr. D. Del. Sept. 5, 2025).

[153] 11 U.S.C. § 101(31)(B).

[154] See id. § 101(2).

35

nonetheless raise the question whether MobileFuse should be treated as a non-statutory insider, that is, a creditor whose dealings with the debtor were conducted at less than arm's length.[155] The same conduct that animates the avoidance counts bears on that question: the Near Insiders' common control of both sides of the transactions, their calculation of MobileFuse's invoices, and the concealed cross-ownership.

The Court need not resolve it. Whether a creditor is a non-statutory insider is a fact-intensive inquiry into the character of the parties' dealings, and the record on a motion to dismiss is not developed enough to undertake it.[156] The Court therefore assumes, without deciding, that MobileFuse is a non-insider and applies the more demanding gross-misconduct standard, which is the standard least favorable to the Trustee. Because the FAC clears that higher bar, the claim survives no matter how MobileFuse's status is ultimately determined. If discovery establishes that MobileFuse dealt with Near at less than arm's length, the claim survives under the lesser showing required of an insider. If it does not, the claim survives under the gross-misconduct standard applied here.

MobileFuse does not argue that the conduct at issue did not result in an injury to other creditors or confer an unfair advantage on the claimant or that

---

[155] See Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.), 554 F.3d 382, 396–97 (3d Cir. 2009) (treating the absence of arm's-length dealing as the touchstone of non-statutory insider status).

[156] See supra Section V.A.2 (deferring the fact-intensive choice-of-law inquiry as inappropriate on the pleadings).

equitable subordination would be inconsistent with the Bankruptcy Code. For the purpose of this motion, the Trustee plausibly alleges that Near and its creditors were harmed by the depletion of over $25 million from its estate,[157] and that equitable subordination would not be inconsistent with the Bankruptcy Code.[158]

## VI.    Conclusion

The Court grants the motion to dismiss in part and dismisses Counts I and II to the extent that they allege constructively fraudulent transfer regarding transfers made by Near Holdco, without prejudice. The Court denies the motion to dismiss in all other respects. The parties are directed to file a form of order under certification of counsel.

Dated: June 17, 2026
Wilmington, Delaware

_____
Thomas M. Horan
United States Bankruptcy Judge

---

[157] FAC ¶¶ 38–48.
[158] FAC ¶ 141.