# Exhibit C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ANIL MATHEWS, RAHUL AGARWAL, KENNETH M. HARLAN, and MOBILEFUSE LLC,**<br><br>**Defendants.** | **26 Civ. 693**<br><br>**<u>COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Anil Mathews ("Mathews"), Rahul Agarwal ("Agarwal"), Kenneth M. Harlan ("Harlan"), and MobileFuse LLC ("MobileFuse") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This action concerns a financial accounting and disclosure fraud committed by Mathews, the former Chief Executive Officer of Near Intelligence, Inc. ("Near"), a global data intelligence company, and Agarwal, Near's former Chief Financial Officer, for improperly inflating revenue from Near's largest customer, MobileFuse, in violation of the antifraud and other provisions of the federal securities laws. Mathews' and Agarwal's violations were aided and abetted by MobileFuse, and its Chief Executive Officer at the time, Harlan.

2. From at least May 2021 to September 2023, Defendants caused Near to engage in a fraudulent round-trip accounting scheme with MobileFuse to overstate Near's reported revenue by on average 27.0% for fiscal years 2021 and 2022 and the first two quarters of 2023.

3. Over the life of the scheme, Near's overstated revenue from MobileFuse accounted for at least $37.3 million of Near's total reported revenue of $138.3 million.

4. The scheme began before Near became a public reporting company, and the fraudulent inflation of Near's revenue was designed, at least in part, to make Near more attractive as a candidate for a Special Purpose Acquisition Company ("SPAC") to take Near public.

5. The scheme relied, in part, on Near and MobileFuse invoicing one another and grossly inflating, sometimes by as much as 98%, the invoiced amounts, and Near recognizing as revenue the full amount of the cash it received according to the grossly inflated MobileFuse invoice.

6. Along with the grossly inflated invoices, the Defendants fabricated documents or made misstatements to conceal the scheme from Near's independent auditors.

7. MobileFuse and Harlan provided substantial assistance to Mathews and Agarwal in perpetrating the round-trip accounting scheme.

8. Along with corporate financial records and third-party bank records, all confirming the round-trip payments, the Defendants' own communications lay out the particulars of the scheme, acknowledging that the purpose of the round-trip scheme was to falsely inflate Near's revenue, or to "juice" the revenue through "the turn around payment system" which "allows [Near's] revenue to be higher."

9. During the round-trip scheme, Mathews and Agarwal intentionally made false statements about Near's revenue and growth during earnings calls and analyst presentations, and were also responsible for false statements about Near's revenue in registration statements and quarterly and current reports filed with the Commission and available to prospective investors.

10. In addition to the round-trip scheme, Mathews also misappropriated over $300,000 from Near to pay for the rental of a luxury single family residence for him and his family and presented false invoices to Near claiming such amounts were for "professional services."

11. Mathews and Agarwal received significant compensation during the schemes including salary and common stock and restricted stock units, and Mathews received a performance-based discretionary bonus.

12. Had the round-trip scheme not been exposed, MobileFuse and Harlan stood to benefit from the scheme through Near's anticipated acquisition of MobileFuse.

13. By engaging in the round-trip scheme and making the false statements in support of that scheme, and for Mathews the misappropriation scheme as well, Mathews and Agarwal (i) violated the antifraud provisions of the federal securities laws, (ii) falsified Near's books and records, and (iii) made false and misleading statements to independent auditors.

14. By aiding and abetting Mathews' and Agarwal's violations of the antifraud provisions of the federal securities laws in the round-trip scheme, MobileFuse and Harlan also violated the antifraud provisions of the federal securities laws.

15. Ultimately, Near's investors were harmed when Near filed for bankruptcy shortly following Near's announcement that its previous financial statements should not be relied upon because certain revenue may have been overstated and that Mathews' and Agarwal's employment had been terminated for cause based on the company's allegations they engaged in financial mismanagement and fraudulent actions.

## VIOLATIONS

16. By virtue of the foregoing conduct and as alleged further herein: (a) Defendants Mathews and Agarwal violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C §§ 78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-1], thereunder; and (b) Defendants MobileFuse and Harlan aided and abetted Mathews and Agarwal's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C § 78m(b)(5)] and Rule 10b-5 thereunder.

17. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object, unless they are restrained and enjoined.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

18. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)].

19. The Commission seeks a final judgment (a) permanently enjoining Mathews and Agarwal from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, by committing or engaging in specified actions or activities relevant to such violations, and permanently enjoining Mathews and Agarwal from violating Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2, thereunder; (b) prohibiting Mathews and Agarwal from serving as an officer or director of any company that has a class of

securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (c) ordering Mathews to disgorge ill-gotten gains he received as a result of the violations this Complaint alleges, and to pay prejudgment interest pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (d) ordering Mathews and Agarwal to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and (e) ordering any other further relief the Court may deem just and proper.

20. The Commission seeks a final judgment (a) permanently enjoining MobileFuse and Harlan from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, by committing or engaging in specified actions or activities relevant to such violations; (b) ordering MobileFuse and Harlan to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and (c) ordering any other further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

21. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. Sections §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

22. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

23. Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. § 78u(d) and 78aa]. Certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York. Near common stock traded on the Nasdaq stock exchange which is located in this district, MobileFuse is headquartered in this district, and certain conduct described below took place in this district.

## DEFENDANTS

24. **Anil Mathews**, age 51, resided in Laguna Niguel, California, at all relevant times. Mathews was a founder of Near and served as its Chief Executive Officer beginning in 2012 until Near's board terminated his employment for cause on or about November 10, 2023. Mathews served as Near's chairman of the board of directors from April 2023 to September 2023. Mathews, and through an entity Mathews co-founded with Agarwal, Uniqequity Pte Ltd., held a 10% equity interest in MobileFuse.

25. **Rahul Agarwal**, age 41, now resides in Bengaluru, India. Agarwal was Near's Vice President of Finance from February 2015 until 2016 when he became Near's Chief Financial Officer. Near's board terminated Agarwal's employment for cause on or about November 20, 2023.

26. **MobileFuse LLC** is a private Delaware limited liability company headquartered in New York, New York. It is a digital advertising company, founded in 2010.

27. **Kenneth M. Harlan**, age 52, resides in Princeton, New Jersey, and co-founded MobileFuse, where, at all relevant times, he was a managing member and served as its Chief

Executive Officer. Before founding MobileFuse, Harlan founded two companies in the advertising technology business, one of which he sold to a publicly traded company. Harlan holds degrees in Masters of Business Administration and a Bachelor of Science in Accounting, and was previously licensed as a Certified Public Accountant in New Jersey.

## RELATED ENTITIES

28. **Near Intelligence, Inc.** was a Delaware corporation headquartered in Pasadena, California, and provided marketing and operational intelligence on consumer behavior and human movement. Its common stock was registered with the Commission pursuant to Sections 12(b) or 12(g) of the Exchange Act after its merger with a SPAC was consummated on March 23, 2023. Near's common stock was traded on the Nasdaq stock exchange under the ticker "NIR." Near filed Chapter 11 Bankruptcy on December 8, 2023 to liquidate its assets and its Plan of Liquidation was approved on March 15, 2024. Near filed a Form 15 on March 28, 2024 terminating its registration with the Commission.

29. **KludeIn I Acquisition Corporation** was a Delaware corporation headquartered in Berkeley, California, and a SPAC. KludeIn was incorporated on September 24, 2020 and its common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act. Before ceasing to exist after merging with Near in March 2023, KludeIn's common stock and warrants were traded on the Nasdaq stock exchange beginning January 11, 2021 under tickers "INKAU," "INKA," and "INKAW."

## FACTS

### I. Mathews Founds Near

30. Mathews founded Near in 2012 to provide data gathering and business intelligence services in Singapore and India.

Case 1:26-cv-00698-JPC Document 1 Filed 01/27/26 Page 8 of 48

31. Near grew through various acquisitions, eventually expanding to the United States in April 2021 with its acquisition of UberMedia, a location data company.

32. Through its acquisitions and technology, Near amassed data on an estimated 1.6 billion unique user IDs and 70 million points of interest in more than 44 countries. The majority of Near's customers and revenue came from the United States, purportedly accounting for 66% of Near's revenue for the year ended December 31, 2022.

33. After Near expanded to the United States it decided to go public via a SPAC.

**II. Near's SPAC Merger with KludeIn**

34. Near's round-trip revenue inflation scheme predated its SPAC merger with KludeIn, and continued after the acquisition closed, artificially inflating Near's revenue to make it appear to be a more attractive acquisition candidate than it actually was.

35. KludeIn was formed as a SPAC, and on May 19, 2022, it announced in a Form 8-K filed with the Commission that it had entered into a merger agreement with Near and estimated Near's valuation to be nearly $1 billion.

36. The Form 8-K that KludeIn filed with the Commission included as exhibits the merger agreement and other transaction documents that Mathews signed on behalf of Near as well as an investor presentation prepared by Near and KludeIn that made statements about Near's business and financial performance, emphasizing Near's revenue.

37. On March 23, 2023, KludeIn's shareholders voted in favor of the merger, with the combined company, now named Near, which commenced trading publicly on Nasdaq on March 24, 2023.

38. In connection with Near's going public merger transaction with KludeIn, Mathews and Agarwal both benefited by receiving Near common stock and restricted stock units.

39. On March 27, 2023, Mathews filed a Form 4 with the Commission disclosing his and KludeIn's holdings of Near common and restricted stock on behalf of himself and his related entity following KludeIn's acquisition of Near. Mathews controlled KludeIn as a result of the merger.

40. On March 27, 2023, Agarwal filed a Form 4 with the Commission disclosing his holdings of Near stock following KludeIn's acquisition of Near.

41. Shortly after Near went public, on or about April 14, 2023, Mathews earned a performance-based discretionary quarterly bonus of $41,331.

42. Upon information and belief, Mathews' performance-based discretionary bonus was granted based on Mathews' role in increasing Near's revenues and the consummation of the business plan to take Near public.

**III. Defendants Develop the Mechanics of the Round-Trip Revenue Scheme**

43. In 2019, and continuing into 2020, Mathews, Agarwal, and Harlan began discussing the possibility of Near and MobileFuse entering into a business relationship, and developed the framework for the round-trip revenue scheme.

44. Upon information and belief, the round-trip revenue scheme was developed at the same time as Mathews, Agarwal, and Harlan discussed a potential acquisition of MobileFuse by Near, because it would be advantageous for Near to show a higher revenue so Near could be acquired and then acquire MobileFuse.

45. In the round-trip revenue scheme, Near would fraudulently inflate its revenue by conveying money to MobileFuse so that MobileFuse could then return those funds to Near, and the amount MobileFuse would pay Near would far exceed the small amount of money that MobileFuse actually owed Near for access to Near's data platform.

46. In December of 2020, Mathews, Agarwal, and Harlan exchanged several emails that outlined how the potential round-trip revenue scheme would work.

47. For example, on December 14, 2020, Harlan emailed Agarwal, and copied Mathews, explaining how MobileFuse would only pay for the services MobileFuse used of the grossly inflated amount shown on the invoice, and Near would transmit the remainder of the amount to MobileFuse which would then return that amount to Near: "Whatever portion of $yyy,yyy is MFX [expenses MobileFuse owes Near for actual data], [MobileFuse] pays Near this amount. Near then pays [MobileFuse] 90% of $yyy,yyy. Whatever portion of $yyy,yyy is nonMFX, [MobileFuse] pays Near this amount[.]"

48. On May 21, 2021, Harlan emailed Agarwal and requested that Near transmit funds to MobileFuse first in the round-trip process and then MobileFuse would return the funds plus whatever small amount MobileFuse actually owed for access to Near's data.

**IV. Mechanics of the Near and MobileFuse Round-Trip Revenue Scheme**

49. In 2021, Near and MobileFuse began to actually engage in the round-trip revenue scheme, by first entering into mutual contracts, one providing MobileFuse access to Near's data platform, and the other providing Near access to MobileFuse's data platform.

50. The companies exchanged minimal actual services under these mutual contracts.

51. However, on top of the payments for these minimal actual services, Mathews, Agarwal, and Harlan overlaid the round-trip revenue scheme between Near and MobileFuse by

grossly inflating the payments made between the companies, and creating invoices, also grossly inflated, as support.

52. In practice the round-trip scheme worked as follows: MobileFuse would send Near an inflated invoice; Near would then wire funds to MobileFuse; in return, MobileFuse would transmit funds back to Near.

53. After receiving payments from MobileFuse, Near booked the entirety of the payments received from MobileFuse as revenue, despite the fact that the majority of the source of those funds actually originated from Near.

54. In advance of the first round-trip payments in May 2021, Mathews, Agarwal and Harlan confirmed the particulars of how the scheme would work.

55. On May 20, 2021, Agarwal emailed Harlan with a blind copy to Mathews, explaining again the mechanics of the round-trip payments and stating that: "See attached the first monthly invoice per our discussion. You will be receiving one such invoice every month from us. I will be sharing with you the calculation for a counter invoice on a month basis post which you can raise the invoice on Near . . ."

56. On May 20, 2021, Harlan replied to Agarwal that the process whereby Near invoices MobileFuse and MobileFuse invoices Near for a slightly smaller amount to account for the actual data used, would "allow your [Near's] revenue to be higher."

57. The first round-trip payment actually occurred on or about May 25, 2021 with Near and MobileFuse transmitting cash to each other on or around the same day.

58. On May 25, 2021, Agarwal sent Harlan an email with a copy to Mathews entitled "Invoicing and Cost Calculations" attaching a spreadsheet entitled "MF – Near Reco." The

spreadsheet indicated that Near would invoice MobileFuse $1,250,000 and MobileFuse would invoice Near $1,185,569.

59. On May 25, 2021, Agarwal emailed Harlan, agreeing that Near would process MobileFuse's invoice and payment that same day so that MobileFuse could initiate the wire immediately thereafter.

60. The MobileFuse invoice Harlan then emailed to Agarwal on or about May 26, 2021 was MobileFuse's counter invoice which was dated April 30, 2021 for $1,185,659.

61. As planned, following receipt of MobileFuse's invoice, Agarwal caused a wire transfer to be sent to MobileFuse for the invoiced amount.

62. After Near's wire cleared, Harlan directed an employee in MobileFuse's finance department ("MobileFuse Finance Employee") to initiate MobileFuse's wire transfer to Near for the amount on Near's invoice to MobileFuse (*i.e.,* $1,250,000), and MobileFuse's co-majority owner authorized and approved MobileFuse's wire transfer, thereby completing the round-trip payment.

63. On May 27, 2021, Harlan, the MobileFuse Finance Employee, and MobileFuse's co-majority owner exchanged emails, acknowledging the Near and MobileFuse round trip payment, which Harlan described as Near "grossing up their revenue. … And they pay us first so no risk in funds."

64. Consistent with invoice calculations described in prior emails between Agarwal and Harlan, MobileFuse's "counter invoice" dated April 30, 2021 of $1,185,569 was netted against Near's April 30, 2021 invoice of $1.25 million, the difference reflecting the actual costs MobileFuse incurred and the actual payment due from MobileFuse to Near in the amount of

$64,431. This $64,431 is the actual amount due for the data access that MobileFuse purchased from Near, substantially less than the $1.25 million that Near listed on its invoice to MobileFuse.

65. Mathews specifically authorized and approved at least two of the round-trip payments and associated phony invoices.

66. For example, on or about May 27, 2021, Mathews sent an email to an employee in Near's finance department with the instruction "we can go ahead with the invoice" referring to MobileFuse's April 2021 invoice to Near, which Agarwal received from the MobileFuse Finance Employee by email May 26, 2021.

67. On or about June 29, 2021, Mathews sent an email to an employee in Near's finance department with the instruction to pay MobileFuse's May 2021 invoice to Near.

68. Mathews also approved at least one wire to MobileFuse.

69. For example, on July 25, 2021, Agarwal emailed an employee in Near's finance department MobileFuse's May 2021 invoice to Near, which the Near employee forwarded to Mathews on the same day along with his request "Please approve the attached payment to MobileFuse." On July 26, 2021, Mathews replied to the Near employee "let's go ahead with this. I've spoken with Rahul [Agarwal]."

## V. Defendants' Contemporaneous Communications Confirm The Round-Trip Scheme and the Substantial Assistance Provided by Harlan and MobileFuse

70. In private communications Defendants regularly described their participation in, and knowledge of, the round-trip scheme between Near and MobileFuse.

### <u>The Turn Around Payment Transactions</u>

71. Specifically, the round-trip scheme was repeatedly described as being for turnaround payments. For example, on June 23, 2021, the MobileFuse Finance Employee

emailed Agarwal, stating: "May 2021 Invoice is attached. Can you schedule payment for Tuesday next week? I'll turn around and pay the 1.25M on Wed (30th)." (Emphasis added).

72. Then again on July 24, 2021, the MobileFuse Finance Employee emailed Agarwal, stating: "Can you schedule our wire to hit Tuesday or Wed (at the latest)? I'll turn it around a day later." (Emphasis added).

73. On July 26, 2021, Agarwal emailed his reply to the MobileFuse Finance Employee agreeing to the wire confirmation and stating: "Please see attached wire confirmation from Near's end. The amount was debited earlier today and should be en-route to reach you Monday or Tuesday. Will be great if you can remit the Near payment ASAP."

74. On July 26, 2021, the MobileFuse Finance Employee emailed his reply to Agarwal, stating: "I see it pending. I should be able to turn your wire around by Wed." (Emphasis added).

75. On July 27, 2021, the MobileFuse Finance Employee emailed Agarwal, stating: "We're getting funded today. I'll do my absolute best to get this turned around by EOD." (Emphasis added).

76. On August 23, 2021, Agarwal and the MobileFuse Finance Employee exchanged emails regarding a new invoice, stating:

> MobileFuse Finance Employee: "Can you process our wire by Wed? I can turn it around by Thurs/Friday at the latest."
>
> Agarwal: "Can you send me the invoice?"
>
> MobileFuse Finance Employee: "Invoice attached. You had 1.5M on the total, I revised down to 1.25M minus the fees." (Emphasis added).

Case 1:25-cv-52298-TMH Doc 51-3 Filed 01/26/26 Page 15 of 48

77. On September 1, 2021, Agarwal and the MobileFuse Finance Employee exchanged emails, which stated:

> MobileFuse Finance Employee: "I wanted to follow up from our emails from last week. Can you confirm the amount is still 1.25M? When will payment be sent so I can turn around your payment.[sic]" (Emphasis added).
>
> Agarwal: "It has to be $1.5M. Anil and I will speak with Ken [Harlan] and then update you. Payment will be done early next week."

78. Other communications by Defendants further demonstrate Defendants' intent for the round-trip revenue scheme to falsely inflate Near's revenue.

79. On February 23, 2022, Harlan and MobileFuse's co-majority owner exchanged text messages, discussing the Near plan to go public via a SPAC, and emphasizing that Near needed MobileFuse to "juice their revenue and they know us best."

80. On March 28, 2023, Harlan and MobileFuse's co-majority owner exchanged text messages, wherein Harlan discussed how MobileFuse had more revenue than Near and that MobileFuse's revenue was actually "real."

**Harlan Limits Knowledge of the Round-Trip Payments Within MobileFuse**

81. Additionally, to further hide the round-trip revenue scheme, Harlan took steps to conceal the round-trip transactions from others within MobileFuse.

82. For example, Harlan delegated tasks related to the round-trip transactions with Near to the MobileFuse Finance Employee, making that individual solely responsible for regularly communicating with Agarwal about the timing of payments and preparing wire transfer instructions for approval by MobileFuse's co-majority owner.

83. Harlan's, Mathews', and Agarwal's knowledge of the round-trip scheme was further demonstrated after Near mistakenly sent a fake invoice to a MobileFuse employee who was not knowledgeable about the scheme and Harlan emphasized that the employee should never have seen the invoice.

84. On or about April 1, 2023, a Near employee sent by email a fake Near invoice in the amount of $1.5 million for a "platform usage fee" to the MobileFuse Finance Employee and to a MobileFuse employee who was not involved in the scheme.

85. On April 1, 2023, Harlan sent Mathews and Agarwal an email, stating: "Guys, I'm really annoyed by this email for so many reasons. . . Why would this be sent to anyone but [MobileFuse Finance Employee] or myself? . . . Sorry to do this but I'm giving you notice that if this isn't resolved in the next few days, I'll just terminate. This [sic] so unprofessional and not executed well. Now I have to explain to a random employee on why we are spending so much with Near."

86. On April 1, 2023, Harlan sent Mathews a text message, stating: "We are heading towards a termination. Your team is so clueless and it is now impacting my team. Sorry about the email and text, but this is really the last straw."

87. On April 2, 2023, Mathews sent Harlan a text about the fake invoice, stating: "Hi Ken, please ignore that email as it's a system generate [sic] message. Not someone sending manually. I agree this shouldn't have come in the first place, and am fixing that. Rahul [Agarwal] will deal directly with [MobileFuse Finance Employee] as always."

88. On April 5, 2023, Agarwal sent an email to Near's director of finance, stating: "Let us make sure no one from Near other than Anil and I contact MF [MobileFuse]."

89. Just days after Harlan, Mathews, and Agarwal agreed to keep knowledge of the round-trip scheme closely held, Harlan and Mathews continued to discuss the possibility of Near acquiring MobileFuse.

90. During the round-trip scheme, Harlan was a corporate officer acting as an agent for MobileFuse within the scope of his employment. Therefore, his intent can be imputed to MobileFuse.

## VI. Defendants Falsify Invoices to Hide the Round-Trip Scheme

91. In several instances, Agarwal fabricated invoices that were never sent to MobileFuse, but rather were simply maintained on Near's books and records, as another means of obscuring the round-trip payments between the two companies.

92. Mathews and Agarwal also falsified at least five invoices to make it look like other vendors were billing Near to mask Near's payments to MobileFuse.

93. For example, Agarwal manipulated an invoice from a Near vendor in Singapore by changing a $100,200 invoice dated January 31, 2023 into a $1,000,200 invoice.

94. The metadata of the original invoice bears the name of Near's vendor, but the metadata on the manipulated invoice has Agarwal's name on it as the author.

95. Agarwal paid the real invoice for $100,200 on a credit card held in his name, which Near subsequently paid.

96. Ultimately the false invoice for $1,000,200 was used to explain to Near's auditors at least one transfer that Near made to MobileFuse through an account Near held at a Singapore-based third-party foreign currency exchange, and over which Agarwal held signatory authority.

97. In other instances, Near paid the amounts of the invoice, not to the vendor whose name appeared on the invoice, but to MobileFuse via the third-party foreign currency exchange.

98. For five payments in 2023 totaling $9.65 million, Agarwal transferred cash from Near's bank accounts to the foreign currency exchange and then directed payments from that exchange to MobileFuse.

99. Utilizing this method of falsifying invoices allowed Mathews and Agarwal to hide the true payee – MobileFuse – in Near's bank accounts and books and records.

## VII. Scope and Duration of the Near and MobileFuse Round-Trip Revenue Scheme

100. This pattern of Near transferring cash to MobileFuse and MobileFuse transferring cash back to Near was repeated multiple times from May 2021 to September 2023. Such cash transactions took place both before KludeIn announced its intention to merge with Near and after consummation of the SPAC merger.

101. Over the course of the scheme, Near recognized the inflated amount it invoiced MobileFuse as revenue.

102. Through the May 2021 through September 2023 period, the round-trip payments between Near and MobileFuse include:

| Date(s) | Near Payment(s) to MobileFuse | MobileFuse Payment(s) to Near |
|---|---|---|
| May 27–28, 2021 | $1,185,569 | $1,250,000 |
| June 30, 2021 | $1,155,880 | $1,250,000 |
| July 26–27, 2021 | $1,167,917 | $1,250,000 |
| October 20–22, 2021 | $2,765,694 | $3,000,000 |
| January 26–27, 2022 | $1,408,046 | $1,500,000 |
| September 28–29, 2022 | $2,845,136<br>($1.595M + $1.25M) | $3,000,000<br>($1.5M + $1.5M) |
| February 6–7, 2023 | $4,295,024 | $4,500,000 |
| February 28, 2023 | $1,404,533 | $1,500,000 |
| May 11, 2023 | $1,369,349<br>($1.25M + $119,349) | $1,500,000 |
| June 15, 2023 | $1,390,481<br>($1.25M + $140,481) | $1,500,000 |
| June 28, 2023 | $2,736,195<br>($2.5M + $236,195) | $3,000,000 |

| | | |
|---|---|---|
| September 13, 2023 | $2,750,574<br>($2.5M + $250,574) | $3,000,000 |
| September 28–29, 2023 | $1,195,508 | $1,500,000 |
| **Total** | **$25,669,906** | **$27,750,000** |

103. Between fiscal year 2021 and the second quarter of 2023, Near recorded $39.75 million of revenue for sales to MobileFuse but only a fraction of that, approximately $2.5 million, or 1.8% of Near's total revenue, were payments for what MobileFuse actually purchased from Near.

104. The vast majority of the alleged revenue to Near from MobileFuse was inflated as depicted below:



105. In total, the round-trip scheme accounted for 24.3% to 27.9% of Near's total reported revenue during fiscal years 2021 and 2022 and the first two quarters of 2023 as depicted in the table below:

| Reporting Period | Amount of Overstated Revenue | Reported Revenue | Overstated Revenue as % of Reported Revenue | SEC Filing (date filed) |
|---|---|---|---|---|
| FY-2021 | $12,028,242 | $45,320,675 | 26.5% | KludeIn Form S-4 (June 30, 2022) |
| FY-2022 | 16,641,664 | 59,745,771 | 27.9% | Near Form S-1 (April 12, 2023) |
| Q1-2023 | 4,303,680 | 15,507,718 | 27.8% | Near Form 10-Q (May 19, 2023) |
| Q2-2023 | 4,302,826 | 17,709,408 | 24.3% | Near Form 10-Q (Aug. 14, 2023) |
| **Total** | **$37,276,412** | **$138,283,572** | **27.0%** | |

## VIII. Mathews and Agarwal Made Materially False and Misleading Statements About Near's Revenues

106. In advance of the consummation of the SPAC transaction Mathews and Agarwal made statements in investor and analyst calls about Near's revenues and revenue growth. All of these statements were materially false and misleading because they contained the fraudulently inflated revenue from the round-trip transactions with MobileFuse which overstated revenue by at least 24% to just under 28% in each relevant reporting period.

107. The misstatements about Near's growth and revenue were material to investors because they demonstrated the success and sustainability of Near's business.

108. A reasonable investor would have considered it important that approximately a quarter of Near's revenue was overstated.

109. On May 19, 2022 on an investor conference call, Mathews made misstatements regarding Near's revenue for fiscal year 2021 and Near's growth rate, including that "we had more than $50 million in ARR [annual recurring revenue]. We've been growing 60% year over year." This statement was materially false and misleading because it was based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

110. On March 16, 2023 at an analyst day presentation, Agarwal made a misstatement regarding Near's revenue for fiscal year 2022, stating that Near's "[e]xpected revenue was $60 million" which was materially false and misleading because it was based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

111. On March 28, 2023 Near filed a Form 8-K with the Commission attaching an earnings release, signed by Agarwal, and Mathews also had authority over the statements regarding revenue made in the filings. In the earnings release Mathews and Agarwal made misstatements regarding Near's revenue for the fourth quarter of fiscal year 2022 and about fiscal year 2022's revenue; specifically with a headline to the release stating "[f]ull year revenue of $59.7 million, up 32% year-over-year[.]" This statement was materially false and misleading because it was based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

112. Contemporaneous with the filing of the March 28, 2023 Form 8-K, on a Near earnings call on March 28, 2023 Mathews falsely represented "Fourth quarter revenue was $15.3 million. Revenue for the Fiscal Year 2022 was $59.7 million." On the same call Agarwal falsely represented "For the fourth quarter of 2022, GAAP revenue was $15.3 million, up 5% year-over-year. For the full year, revenue was $59.7 million, marking the 32% growth from the

year-ago period." These statements were materially false and misleading because they were based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

113. As outlined in detail below, after going public, between April 12, 2023 and July 26, 2023, Near filed numerous registration statements and amendments thereto for various offerings of stock and warrants (collectively, the "Near Registration Statements"), each of which was signed by Mathews, containing materially false and misleading statements about Near's revenues, revenue growth, and business relationship with MobileFuse.

114. Near also made materially false and misleading statements about its revenues in its current reports contained in Forms 8-K and quarterly reports in its Forms 10-Q filed with the Commission.

115. On April 12, 2023, May 10, 2023, and again on May 10, 2023 Near filed three separate S-1 Registration Statements with the Commission, which were signed by Mathews, and Agarwal also had authority over the statements regarding Near's revenue made in the filings. All of the statements regarding Near's revenue in 2021 and 2022 were materially false and misleading because they were based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions. These statements included at least the following misstatements in each of the S-1 Registration Statements regarding revenue from MobileFuse and the overall increase in revenue in fiscal years 2021 and 2022:

a. "Our largest customer, MobileFuse, LLC, is a channel partner that represented approximately 30% of our annual revenue for each of the years ended December 31, 2022 and 2021"'

b. "In January 2020, Near entered into an agreement with MobileFuse, LLC ("MobileFuse"), which accounted for approximately 30.0% of revenue for each of the years ended December 31, 2022 and 2021"

c. "One of our customers, MobileFuse, LLC, accounted for approximately 30.0% of our revenues for each of the years ended December 31, 2022 and 2021."

d. "As of December 31, 2022, we had revenue generating customers across the globe and we feel that Near Platform can help businesses in all stages of maturity and across all industries to help produce better results. Our revenue for the year ended December 31, 2022 was $59.7 million, an increase of $14.4 million from the year ended December 31, 2021."

e. "Revenue increased by $14.4 million for the year ended December 31, 2022 compared to the year ended December 31, 2021, primarily due to organic growth of new customers and expansion of revenue with existing customers."

f. The Registration Statements all also included a table indicating revenue for 2022 was $59,745,771, revenue for 2021 was $45,320,675 suggesting an increase of $14,425,096 in revenue over that time period.

116. On May 15, 2023, Near filed a Form 8-K with the Commission, which was signed by Agarwal, and over which Mathews had authority over statements concerning Near's revenue, and issued a press release announcing financial results for the first quarter of 2023 with the headline "Q1 2023 revenue of $15.5 million, up 10% year-over-year. . ." This statement was materially false and misleading because it was based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

117. On May 19, 2023, Near filed a 10-Q quarterly report with the Commission, which was signed by Mathews and Agarwal and over which they both had control over statements regarding revenue made in the filing. The 10-Q contained numerous misstatements regarding Near's revenue which were materially false and misleading because they were based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions, including at least the following:

a. "One of our customers, MobileFuse, LLC, accounted for approximately 28.5% and 31.1% of our revenues for the three months ended March 31, 2023 and 2022, respectively."

b. "Our largest customer, MobileFuse, LLC, is a channel partner that represented approximately 28.5% and 31.1% of our revenue for the three months ended March 31, 2023 and 2022, respectively."

c. The 10-Q also included a table with revenue for the three months ending March 21, in 2022 and 2023 with alleged revenue of $14,058,602 and $15,507,718 respectively.

118. On May 31, 2023, Near filed an S-1 Registration Statement with the Commission, which was signed by Mathews, and Agarwal also had authority over the statements regarding revenue made in the filing. All of the statements regarding Near's revenue were materially false and misleading because they were based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions. These statements included at least the following misstatements regarding revenue from MobileFuse and the overall increase in revenue in fiscal years 2021, 2022, and 2023:

a. "Our largest customer, MobileFuse, LLC, is a channel partner that represented approximately 28.5% and 31.1% of our revenue for the three months ended March 31, 2023 and 2022, respectively."

b. "In January 2020, Near entered into an agreement with MobileFuse, LLC ("MobileFuse"), which accounted for approximately 30.0% of revenue for each of the years ended December 31, 2022 and 2021 (as amended, the "Channel Partner Agreement")."

c. "One of our customers, MobileFuse, LLC, accounted for approximately 28.5% and 31.1% of our revenues for the three months ended March 31, 2023 and 2022, respectively."

d. "As of March 31, 2023, we had revenue generating customers across the globe and we feel that the Near Platform can help businesses in all stages of maturity and across all industries to help produce better results. Our revenue for the three months ended March 31, 2023 was $15.5 million, an increase of $1.4 million from the three months ended March 31, 2022, and our revenue for the year ended December 31, 2022 was $59.7 million, an increase of $14.4 million from the year ended December 31, 2021."

e. "Revenue increased by $14.4 million for the year ended December 31, 2022 compared to the year ended December 31, 2021, primarily due to organic growth of new customers and expansion of revenue with existing customers."

f. The Registration Statement also included a table indicating revenue for 2022 was $59,745,771, revenue for 2021 was $45,320,675 suggesting an increase of $14,425,096 in revenue over that time period.

119. Near then filed six S-1 Registration Statement Amendments on June 9, 2023 (Amend. No. 1 No. 333-271229), July 6, 2023 (Amend. No. 1, No. 333-27195), July 7, 2023 (Amend. No. 1 No. 333-272300), July 26, 2023 (Amend No. 2 No. 333-271229), July 26, 2023 (Amend. No. 2 No. 333-272300), July 26, 2023 (Amend No. 2 No. 333-271795) with the Commission, which were all signed by Mathews, and Agarwal also had authority over the statements regarding revenue made in the filings. All of the statements in these filings regarding Near's revenue were materially false and misleading because they were based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions. These statements included at least the following misstatements regarding revenue from MobileFuse and the overall increase in revenue in fiscal years 2021, 2022, and 2023:

a. "Our largest customer, MobileFuse, LLC, is a channel partner that represented approximately 28.5% and 31.1% of our revenue for the three months ended March 31, 2023 and 2022, respectively."

b. "In January 2020, Near entered into an agreement with MobileFuse, LLC ("MobileFuse"), which accounted for approximately 30.0% of revenue for each of the years ended December 31, 2022 and 2021 (as amended, the "Channel Partner Agreement")."

c. "One of our customers, MobileFuse, LLC, accounted for approximately 28.5% and 31.1% of our revenues for the three months ended March 31, 2023 and 2022, respectively."

d. "As of March 31, 2023, we had revenue generating customers across the globe and we feel that the Near Platform can help businesses in all stages of maturity and across all industries to help produce better results. Our revenue for the three

months ended March 31, 2023 was $15.5 million, an increase of $1.4 million from the three months ended March 31, 2022, and our revenue for the year ended December 31, 2022 was $59.7 million, an increase of $14.4 million from the year ended December 31, 2021."

e. "Revenue increased by $14.4 million for the year ended December 31, 2022 compared to the year ended December 31, 2021, primarily due to organic growth of new customers and expansion of revenue with existing customers."

f. The Registration Statement also included a table indicating revenue for 2022 was $59,745,771, revenue for 2021 was $45,320,675 suggesting an increase of $14,425,096 in revenue over that time period.

120. On August 14, 2023, Near filed a Form 8-K with the Commission, which was signed by Agarwal, and over which Mathews had authority over the statements concerning revenue, and issued a press release announcing financial results for the second quarter of 2023 with the headline "Q2 2023 revenue of $17.7 million, up 19% year-over-year. . ." This statement was materially false and misleading because it was based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

121. Contemporaneous with the filing of the August 14, 2023 Form 8-K, on a Near earnings call on August 15, 2023 Mathews falsely represented "Second-quarter revenue was $17.7 million, the midpoint of our guidance range." On the same call Agarwal falsely represented "For the second quarter of 2023, GAAP revenue was $17.7 million, at the midpoint of our guidance, and up 19% year over year." These statements were materially false and misleading because they were based upon the fraudulently inflated revenue from the MobileFuse round-trip transactions.

122. The representations in Near's filings as well as Mathews' and Agarwal's public statements were all materially false and misleading because they included improperly recognized revenue from the round-trip scheme. Near's total company revenue as reported in its Commission filings for fiscal years 2021 and 2022, and the first and second quarters of 2023, were overstated by at least 24.3% in each reporting period.

123. In additional false representations, Mathews and Agarwal also falsely certified the accuracy of Near's financial results filed with the Commission.

124. For example, the May 19, 2023 and August 14, 2023 quarterly financial reports Near filed with the Commission were signed by both Mathews and Agarwal.

125. In both filings Mathews and Agarwal certified that they reviewed the quarterly reports on Near's Form 10-Q and, based on their knowledge, that the "report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

126. Despite signing the certification as to the fact that the quarterly financial reports did not contain untrue statements, Mathews' and Agarwal's statements in the May 19, 2023 and August 14, 2023 quarterly financial reports Near filed with the Commission were actually materially false and misleading because they did not acknowledge the actual financial reality of the inflated revenue from the MobileFuse round-trip payments.

127. Mathews and Agarwal both had ultimate authority over Near's statements about its revenues and revenue growth in its SEC filings and are thus the makers of the statements.

128. The workpapers of Near's independent auditors identified Mathews and Agarwal as responsible for preparing Near's financial statements, and Mathews and Agarwal are thus the makers of the statements in Near's financial statements regarding Near's revenue and growth.

**IX. Mathews and Agarwal's False and Misleading Statements and the Fraudulent Round-Trip Scheme Were in Connection with the Offer or Sale of Securities**

129. The round-trip accounting scheme and Mathews' and Agarwal's false and misleading statements were in connection with the offer or sale of securities.

130. In 2023 upon completion of the merger with KludeIn, Near conducted its own stock and warrant offerings and the misconduct was made in connection with the purchase and sale of Near securities, as well as in the offer and sale of such securities, including in offering documents provided to investors in the course of offering-related discussions.

**X. Mathews and Agarwal Both Made Misrepresentations to Near's Independent Auditors Regarding Near's Revenues**

131. Near engaged an independent auditor to audit Near's financial statements for Near's 2020, 2021, and 2022 fiscal year audits and quarterly reviews for Q1 and Q2 of 2023.

132. Near engaged this independent auditor for the purpose of having audited financial statements in advance of the process of going public.

133. Mathews and Agarwal also each signed management representation letters dated May 10, 2022 and March 6, 2023 that were provided to Near's independent auditors as part of its audit of Near's annual financial statements as of December 31, 2021 and 2020, and December 31, 2022 and 2021, respectively.

134. These Near annual financial statements were included in KludeIn's and Near's registration statements.

135. Mathews and Agarwal signed the management representation letters in relation to the auditors' review of Near's financial statements, for the first two quarters of 2023.

136. In each instance, Mathews and Agarwal falsely represented, among other things, that Near's financial statements were fairly presented in conformity with GAAP; they had made available all financial records and related data; there were no implicit provisions or unstated customary business practices or other arrangements that affected the amount or timing of revenue reported, and they had not received any communications, nor did they have knowledge of, any fraud, allegations of fraud, or suspected fraud that could have a material effect on the financial statements.

137. In addition to requesting signed management representation letters, Near's auditors made detailed inquiries with Mathews and Agarwal regarding their awareness of any allegations of fraudulent activity or any actual instances of fraud at Near; both Mathews and Agarwal responded "No" in response to the auditors' inquiries.

138. Mathews and Agarwal's representations to the auditors were false as they did not disclose the overstatement of Near's revenues, the round-trip payments with MobileFuse, or that Mathews presented false invoices for "professional services" in an apparent effort to cover Near's payments for Mathews' rental of a single family residence in Laguna Beach, California, as alleged more fully below.

## XI. MobileFuse and Harlan Provide Two False Audit Confirmation Letters to Near's Auditors in Connection with the Scheme to Defraud

139. In connection with Near's audit, Harlan signed a false audit confirmation letter himself, and also directed the MobileFuse Finance Employee to sign a false audit confirmation letter. Both of these letters were provided to Near's auditors.

**<u>The First False Audit Confirmation Letter</u>**

140. Specifically, on April 15, 2022, Agarwal emailed Mathews that Near's independent auditor would send an audit confirmation letter to MobileFuse and Agarwal wrote: "We need Ken [Harlan] to sign off in this positively. Will be great if you let him know."

141. On April 18, 2022, Mathews emailed Harlan about the audit confirmation letter and stated: "Could you please take care of this."

142. On April 18, 2022, Harlan forwarded the audit confirmation letter to the MobileFuse Finance Employee.

143. On April 18, 2022, the MobileFuse Finance Employee signed, at Harlan's direction, an audit confirmation letter that was provided to Near's independent auditor in connection with the auditors' audit of Near's financial statements for the year ending December 31, 2021.

144. MobileFuse's audit confirmation letter, signed by the MobileFuse Finance Employee, attested to the legitimacy of four purported MobileFuse invoices to Near, issued between September 30, 2021 and December 31, 2021, for $1.5 million each. However, these invoices were not legitimate, and were part of the round-trip scheme.

145. MobileFuse's April 18, 2022 audit confirmation letter, signed by the MobileFuse Finance Employee at Harlan's direction, contained false and misleading information that was provided to Near's independent auditor.

**<u>The Second False Audit Confirmation Letter</u>**

146. On February 8, 2023, Near's independent auditor then sent Harlan an audit confirmation letter listing several Near invoices and again asked Harlan to confirm that MobileFuse owed those sums to Near.

147. On February 22, 2023, Agarwal emailed Harlan, copying Mathews and the MobileFuse Finance Employee, requesting Harlan's execution of the audit confirmation letter. Agarwal wrote: "Please confirm once the audit confirmation has been signed and shared. We are required to complete by Friday to sense there is no default as we are going public and as such will appreciate if this is done at the earliest."

148. Harlan was aware in early February 2023 that Near was poised to become a publicly traded company in March 2023.

149. On February 21, 2023, Harlan and the MobileFuse Finance Employee exchanged text messages, which stated:

> Harlan: "Did you know Anil invited me to their [N]asdaq celebration party."
>
> MobileFuse Finance Employee: "Ha no."
>
> Harlan: "They are going public third week of March. I've already indicated that once he goes public, I have some ideas. He will want to buy the whole thing. But that's not happening."
>
> MobileFuse Finance Employee: "No way on MFX [MobileFuse] with the explosion 💥 that will happen."

150. On February 21, 2023, the same day that Harlan told a subordinate that he was invited to the party celebrating Near's listing on the Nasdaq market, he signed on behalf of MobileFuse a false audit confirmation letter for Near's independent auditors attesting to a series of fake invoices for $1.5 million each from 2022.

151. MobileFuse's audit confirmation letter, signed by Harlan, attested to the legitimacy of nine purported MobileFuse invoices to Near, issued between April 20, 2022 and

December 31, 2022, for $1.5 million each. However, these invoices were not legitimate, and were part of the round-trip scheme.

**XII. The Defendants' Financial Interests in the Round-Trip Scheme**

152. The Defendants engaged in the round-trip revenue scheme to further their own financial interests.

153. In their early discussions about various business transactions between Near and MobileFuse, Mathews and Agarwal discussed with Harlan and MobileFuse's co-majority owner the potential for Near to acquire MobileFuse, which would provide a personal benefit to Harlan and MobileFuse's co-majority owner as the majority owners of MobileFuse.

154. During the time Mathews and Agarwal engaged in the round-trip scheme with MobileFuse, they each received significant compensation from Near.

155. Near's Form S-1 filed on April 12, 2023 identified Mathews' and Agarwal's total compensation as $17,194,800 and $8,739,257, respectively.

156. Mathews and Agarwal received Near common stock and restricted stock units upon completion of Near's merger with KludeIn.

157. Shortly after Near went public, Mathews' and Agarwal's base compensation was increased as announced in Near's Form 8-K filed with the Commission on April 11, 2023.

158. The Form 8-K disclosed that Mathews' annual base salary was $400,000 and Agarwal's was $462,000 (SGD) or approximately $350,000 (USD).

159. Additionally, Mathews was awarded a performance-based discretionary quarterly bonus in the second quarter of 2023 totaling $41,331.

160. Mathews and Agarwal received this compensation as a result of the SPAC KludeIn merger, which was approved based on financial statements incorporating the false revenues from the round-trip scheme.

161. Therefore, both Mathews and Agarwal obtained money or property by means of their misstatements.

**XIII. Mathews and Agarwal Make a $2 Million Dollar Payment to MobileFuse**

162. In addition to the round-trip payments, Mathews and Agarwal also invested $2 million in MobileFuse, and then allowed their investment to be repurchased for only $12,019.14. This resulted in a $2 million payment to MobileFuse.

163. In January 2021, a few months before the first round-trip transaction, Mathews and Agarwal purchased a 10% interest in MobileFuse for $2 million through Mathews and Agarwal's Singaporean entity Uniqequity.

164. Uniqequity purchased Class B nonvoting shares of MobileFuse,.

165. MobileFuse then used the sale proceeds from the $2 million to repay personal loans Harlan and MobileFuse's co-majority owner made to MobileFuse.

166. Ultimately in the summer of 2023, shortly after Near became a public company through the KludeIn merger, MobileFuse repurchased these shares for only $12,019.14, far less

than what Mathews and Agarwal had paid for these shares, essentially leaving MobileFuse and Harlan the benefit of the $2 million.

**XIV. Mathews Presents False Invoices to Conceal His Misappropriation of Funds To Pay for His Personal Residence and Falsify's Near's Accounting Records**

167. Between January 2023 and October 2023, Mathews also presented false invoices, totaling $312,000, which on their face purported to be for professional services provided to Near, which resulted in Near falsely booking the expenses as such.

168. In reality, however, the amounts due related not to professional services provided to Near by the individuals listed on the invoice, but were actually for Mathews' rent for a single family residence in Laguna Beach, California.

169. The purported "professional services" invoices were as follows: invoice dated January 1, 2023 for $132,000; invoice dated June 1, 2023 for $60,000; and invoice dated September 1, 2023 for $120,000. These amounts were for rent Mathews owed to the owners of the Laguna Beach property he rented.

170. While the invoices purported to be from the individuals who were subsequently identified as the property owners of Mathews' rental home in Laguna Beach, the property owners had never seen or authorized the invoices, and the payments from Near were Mathews' rent on the home in Laguna Beach, not for any professional or consulting services.

171. While Near's policies would have required such payments to be authorized by Near's compensation committee, the committee had not authorized such payments to Mathews.

172. On or about June 11, 2022, Mathews emailed Near's finance department titling the email "Urgent Wire" and attaching the first purported invoice for "professional services." Mathews wrote: "Can you please transfer US $162,000 to the attached account urgently. Put my

full name as reference. Rahul will be able to tell you the exact line item this goes under. And do send me a confirmation by Monday EOD your time." Mathews' email included the wire transfer instructions for the property owner.

173. On or about July 9, 2023, Mathews emailed Near's finance department with another invoice for "professional services," dated June 1, 2023 in the amount of $60,000. Mathews wrote: "Have spoken to you and [Agarwal] on this. Please clear this invoice in priority. Also, send me a confirmation once it's done."

174. Mathews knew the invoices were false because, at the time, he was aware there was no underlying support of documentation of "professional services" rendered to Near or himself by the person whose name was on the invoices.

175. Near made at least three payments on the purported "professional services" invoices as follows: $132,000 on or about January 3, 2023; $60,000 on or about July 11, 2023, and $120,000 on or about September 11, 2023. These payments were sent to and received by the owner of the Laguna Beach property that Mathews rented.

176. The entries on Near's books and records for the payments totaling $312,000 to the Laguna Beach property owner as "Professional and Consultancy" and other line items were inaccurate.

177. On or about September 27, 2023, the chairman of Near's audit committee asked Near's management for an itemization of, and substantiation for, expenses Near paid for the benefit of Near's executive team including Mathews.

178. After the termination of his employment, Mathews filed a Statement of Claim against Near before the American Arbitration Association. In Paragraph 22 of Mathews'

Statement of Claim, he admitted that Near's payments to the property owners was, in fact, for his rent.

**XV. Near Terminated Mathews' and Agarwal's Employment and Filed for Bankruptcy**

179. On October 5, 2023 Near's board of directors announced in a filing with the Commission that effective October 1, 2023 it had placed Mathews and Agarwal on administrative leave pending an internal investigation conducted by outside legal counsel.

180. Near's board further announced in its filing that Near's financial statements for the years ended December 31, 2022, 2021 and 2020, and the company's quarterly financial statements for the quarters ended March 31, 2023 and June 30, 2023 should not be relied upon because certain revenue may have been overstated.

181. Near's board of directors announced in filings with the Commission that it terminated the employment of Mathews and Agarwal on November 15, 2023 and November 21, 2023, respectively.

182. On December 8, 2023, Near filed for Chapter 11 bankruptcy protection to liquidate its assets. Near's Plan of Liquidation was approved on March 15, 2024.

183. Near filed a Form 15 on March 28, 2024 terminating its registration with the Commission.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Against Mathews and Agarwal)**

184. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

185. As alleged above, Mathews and Agarwal engaged in a fraudulent round-trip revenue scheme. Mathews' and Agarwal's planning and accounting for the fraudulent

transactions with MobileFuse and their dissemination of false public statements about Near's revenues and growth operated as a fraud or deceit upon purchasers of Near's shares. The round-trip revenue scheme depicted Near to be a highly successful company with revenue growth, a portrayal that Mathews and Agarwal knew, or were reckless in not knowing, was dependent on their continuing fraud with MobileFuse.

186. Mathews and Agarwal also intentionally made materially false and misleading statements about Near's revenue and growth during earnings calls and analyst presentations, and they also were responsible for statements about the company's revenue in the Near Registration Statements, and quarterly and current reports.

187. As set forth above, these false and misleading statements were material because revenue was overstated by at least 24% to just under 28% in each relevant reporting period. Similarly, the misstatements about Near's growth were material to investors because they demonstrated the success and sustainability of its business.

188. As set forth above, Defendants' misconduct was made in connection with the purchase and sale of Near securities, including in offering documents provided to investors in the course of offering-related discussions.

189. By engaging in the conduct described above, Defendants, each of them, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and/or

c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

190. Defendants knew, or were reckless in not knowing, that they employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

191. By reason of the foregoing, Defendants violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act (Against Mathews and Agarwal)

192. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

193. As alleged above, Mathews and Agarwal engaged in a fraudulent round-trip revenue scheme. Mathews' and Agarwal's planning and accounting for the fraudulent transactions with MobileFuse and their dissemination of false public statements about Near's revenues and growth operated as a fraud or deceit upon purchasers of Near's shares. The round-trip revenue scheme depicted Near to be a highly successful company with revenue growth, a portrayal that Mathews and Agarwal knew, or were reckless in not knowing, was dependent on their continuing fraud with MobileFuse.

194. Mathews and Agarwal also intentionally made materially false and misleading statements about Near's revenue and growth during earnings calls and analyst presentations, and they also were responsible for statements about the company's revenue in the Near Registration Statements, and quarterly and current reports.

195. Mathews and Agarwal also obtained money or property by means of these untrue statements overstating Near's revenue as they both received shares upon completion of Near's merger, their compensation was increased after Near went public, and Mathews earned a performance-based discretionary bonus.

196. As set forth above, these false and misleading statements were material because revenue was overstated by at least 24% to just under 28% in each relevant reporting period. Similarly, the misstatements about Near's growth were material to investors because they demonstrated the success and sustainability of its business.

197. As set forth above, Defendants' misconduct was made in connection with the offer or sale of Near securities, including in offering documents provided to investors in the course of offering-related discussions.

198. By engaging in the conduct described above, Defendants, each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. employed devices, schemes, or artifices to defraud;

b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c. engaged in transactions, practices, or courses of business which operated or would

Case 1:26-cv-00698-JPC Document 1 Filed 01/27/26 Page 41 of 48

operate as a fraud or deceit upon the purchaser.

199. Defendants engaged in this conduct intentionally, knowingly, or with severe recklessness.

200. By reason of the foregoing, Defendants violated, and unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Mathews' and Agarwal's Violations of Section 17(a) of the Securities Act (Against MobileFuse and Harlan)

201. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

202. As alleged above, Mathews and Agarwal violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] by engaging in a round-trip accounting scheme to fraudulently inflate Near's revenue.

203. Harlan provided substantial assistance to Mathews and Agarwal in their primary violations, and his actions can be imputed to MobileFuse. Harlan developed the round-trip accounting scheme with Mathews and Agarwal and instructed the MobileFuse Finance Employee on how the transactions would be structured. On behalf of MobileFuse, Harlan signed and directed the MobileFuse Finance Employee to sign, false audit confirmation letters to Near's auditors. By participating in Near's round-trip revenue scheme, MobileFuse and Harlan helped Mathews and Agarwal falsely portray Near, both before and after the SPAC merger, as a growing, successful company with sizable revenues.

204. Harlan had actual knowledge that Mathews and Agarwal were inflating Near's revenues, as reflected in emails and text massages in which they discussed the round-trip

scheme. Harlan also limited knowledge of the round-trip transactions within MobileFuse showing his actual knowledge of the round-trip scheme.

205. Harlan, whose scienter can be imputed to MobileFuse, and MobileFuse knowingly or recklessly provided substantial assistance to both Mathews and Agarwal with respect to their violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

206. By reason of the foregoing, MobileFuse and Harlan are liable for aiding and abetting Mathews and Agarwal's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and unless enjoined, MobileFuse and Harlan will again aid and abet these violations.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Mathews' and Agarwal's Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder (Against MobileFuse and Harlan)

207. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

208. As alleged above, Mathews and Agarwal violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] by engaging in a round-trip accounting scheme to fraudulently inflate Near's revenue.

209. Harlan provided substantial assistance to Mathews and Agarwal in their primary violations, and his actions can be imputed to MobileFuse. Harlan developed the round-trip accounting scheme with Mathews and Agarwal and instructed the MobileFuse Finance Employee on how the transactions would be structured. On behalf of MobileFuse, Harlan signed and directed the MobileFuse Finance Employee to sign, false audit confirmation letters to Near's auditors. By participating in Near's round-trip revenue scheme, MobileFuse and Harlan helped

Mathews and Agarwal falsely portray Near, both before and after the SPAC merger, as a growing, successful company with sizable revenues.

210. Harlan had actual knowledge that Mathews and Agarwal were inflating Near's revenues, as reflected in emails and text massages in which they discussed the round-trip scheme. Harlan also limited knowledge of the round-trip transactions within MobileFuse showing his actual knowledge of the round-trip scheme.

211. Harlan whose scienter can be imputed to MobileFuse, and MobileFuse, provided knowing or substantial assistance to Mathews and Agarwal with respect to their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

212. By reason of the foregoing, MobileFuse and Harlan are liable for aiding and abetting Mathews and Agarwal's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and unless enjoined, MobileFuse and Harlan will again aid and abet these violations.

## FIFTH CLAIM FOR RELIEF

### Knowingly Falsifying Books, Records, or Accounts
### Violations of Section 13(b)(5) of the Exchange Act
### (Against Mathews and Agarwal)

213. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

214. As alleged above, as part of the round-trip revenue scheme with MobileFuse, Mathews and Agarwal knowingly falsified Near's books and records. Mathews approved at least two fraudulent wire transfers to MobileFuse and Agarwal manipulated an invoice from a Near

vendor by changing a $100,200 invoice into a $1,000,200 invoice, which was used to conceal payments to MobileFuse.

215. By engaging in the conduct described above, Mathews and Agarwal violated, and unless enjoined, will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## SIXTH CLAIM FOR RELIEF

**Falsifying Books and Records**
**Rule 13b2-1 of the Exchange Act**
**(Against Mathews and Agarwal)**

216. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

217. As alleged above, Mathews and Agarwal directed, fabricated, or approved false invoices from Near's vendors to support and conceal transactions resulting in Near's false accounting. Mathews and Agarwal also signed periodic reports containing Near's overstated revenue.

218. Mathews also directly or indirectly caused Near's books and records to be falsified when he submitted to finance staff invoices that falsely stated were for "professional services" but were in fact for rent of his personal residence. These payments were inaccurately categorized as "Professional and Consultancy" on Near's books.

219. By engaging in the conduct described above, Mathews and Agarwal each knowingly directly or indirectly falsified, or caused to be falsified, books, records, or accounts of Near, an issuer subject to Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

220. By reason of the foregoing, Mathews and Agarwal violated, and unless enjoined, will again violate, Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

Case 25-52298-TMH Doc 51-3 Filed 09/01/25 Page 46 of 48

## SEVENTH CLAIM FOR RELIEF

**False Statements to Accountants**
**Violations of Rule 13b2-2 of the Exchange Act**
**(Against Mathews and Agarwal)**

221. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-183, inclusive, as if they were fully set forth herein.

222. As alleged above, Mathews and Agarwal made false representations in Near's management representation letters in connection with required audits of Near's financial statements, including that: Near's financial statements were fairly presented in conformity with GAAP; there were no implicit provisions or unstated customary business practices or other arrangements that affected the amount or timing of revenue reported; and they had no knowledge of any fraud, allegations of fraud, or suspected fraud that could have a material effect on the financial statements. Mathews' and Agarwal's false representations concealed facts surrounding the round-trip revenue arrangement with MobileFuse.

223. Mathews and Agarwal also deceived their accountants when each signed management representation letters for the 2021 and 2022 annual audits and quarterly reviews for the first and second quarters of 2023 representing that they had made available all financial records and related data, but in fact concealed documents regarding the round-trip scheme with MobileFuse.

224. By engaging in the conduct described above, Defendants Mathews and Agarwal directly or indirectly: (1) made or caused to be made a materially false or misleading statement or (2) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with, among other things, a required audit,

review or examination of the issuer's financial statements or the preparation or filing of any document or report required to be filed with the Commission.

225. By reason of the foregoing, Mathews and Agarwal violated, and unless enjoined, will again violate Rule 13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently enjoining Defendants Mathews and Agarwal and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1], Rule 13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2], and Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

II.

Permanently enjoining Defendants MobileFuse and Harlan, and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)(1)].

III.

Prohibiting Defendants Mathews and Agarwal from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

IV.

Ordering Defendant Mathews to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

V.

Ordering Defendants Mathews, Agarwal, MobileFuse, and Harlan to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

**VI.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY DEMAND**

The Commission demands a trial by jury.

Respectfully submitted,

Date: January 27, 2026

/S/ Kathryn C. Wanner
Kathryn C. Wanner*
Securities and Exchange Commission
Los Angeles Regional Office
444 S. Flower St., Suite 900
Los Angeles, CA 90071
(323) 965-3954
*wannerk@sec.gov*

*Pending admission pro hac vice